BILLY RAY RILEY, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 21240

March 28, 1991                                          808 P.2d 551

[Rehearing denied May 9, 1991]

*Morgan D. Harris,* Public Defender and *Stephen J. Dahl,* Deputy Public Defender, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney and *William T. Koot,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

A jury convicted the appellant, Billy Ray Riley, of first degree

murder with use of a deadly weapon and robbery with use of a deadly weapon. Thereafter, Riley was sentenced to two consecutive terms of life without the possibility of parole and to a sentence of death. For the reasons set forth below, we affirm the convictions and the sentences imposed pursuant to those convictions, including the sentence of death.

## THE FACTS

Albert "Ramrod" Bollin was killed by a single gunshot wound to the chest on October 1, 1989. The weapon used to kill Bollin was a sawed-off .410 caliber shotgun that belonged to the appellant, Billy Ray Riley. Three persons, Darrell Lee Jackson, Kim Johnson, and Leotis Gordon, were at or near the scene where Ramrod Bollin was shot, and all three testified at trial.

Darrell Lee Jackson told the jurors that sometime after 8:30 a.m. on the morning of the shooting, he and Ramrod Bollin arrived at Leotis Gordon's residence where they met Billy Ray Riley. Riley asked Ramrod Bollin if he had any drugs. Then, all three men proceeded to a bedroom-lounge located in the home.

According to Jackson, appellant Riley was emotional and angry about the treatment he had received from drug dealers, and Riley said he was going to start robbing drug dealers who did not treat him appropriately. Thereafter, Darrell Jackson and Ramrod Bollin gave some rock cocaine to Billy Ray Riley, and Riley smoked the cocaine while Ramrod Bollin went into the bathroom to take a shower. Jackson testified that while Ramrod Bollin was in the shower, Riley began to ask about the money and drugs Ramrod Bollin had in his possession.

When Ramrod Bollin finished his shower, the three men went into Ramrod's room. Ramrod Bollin sat on the dresser facing Riley who was sitting on a bed. Riley was holding the shotgun and Jackson was standing near Ramrod toward the middle of the dresser. At that point, Jackson testified that Billy Ray Riley killed Ramrod Bollin:

Q   Was there some conversation between Billy Ray Riley and "Ramrod" at that time?

A   Yes. Billy asked him whose dope he had and "Ramrod" said "it's none [sic] mine." So Billy Ray say "it's mine now," you know.

And "Ramrod" said, "no, dude. You know you're going to have to kill me first, you know."

And so Billy Ray asked him "was he ready to die?" He said, "all right. Let me finish taking this hit, you know."

And after he—after he smoked the dope, then he put down his pipe, he asked him whether he was ready to die. He said "yeah." So Billy Ray shot him.

Kim Johnson also testified at trial. She said she was cooking in the kitchen when Ramrod Bollin was shot. She told the jury that just before the shooting, she heard Ramrod say, "if you're going to kill me, just kill me." Then she heard the flick of a cigarette lighter, and thereafter, a gunshot blast. Kim Johnson left the kitchen and walked toward the bedroom. She arrived at the scene in time to see Ramrod sitting upright on the dresser, clutching his chest. Riley was on the bed holding his shotgun.

At that point, Kim Johnson heard Ramrod Bollin say "Leo" and she exited towards Leotis Gordon's room across the hall. According to Johnson, Leotis Gordon asked her what had happened. Riley and Jackson also came into Gordon's bedroom and Riley told Johnson to go to the front room of the house and get a container of shotgun shells.

Leotis Gordon also testified. He told the jurors that he was sleeping in his room and was awakened by the gunshot blast. Gordon said he heard someone call "Leo, run." Gordon responded by asking, "what's going on in there?" Then Gordon said he proceeded to the bedroom window, apparently to get out of the home. Before Gordon could leave, Riley appeared in the doorway of the bedroom with the shotgun, and told Gordon to "just hold it."

Gordon testified that Riley then told Jackson to get Ramrod Bollin's money and drugs. Thereafter, Riley, Jackson, Johnson, and Gordon proceeded to the living room. While they were in the home, Riley had the shotgun in his possession most of the time, but allowed Jackson to hold the shotgun for approximately five minutes. Gordon said he was afraid for his life when he asked Riley, "why kill 'Ramrod' for nothing? He didn't have nothing. . . . [W]hy don't you get 'L.L.' He's the guy that has something."[1] Riley apparently thought this question over and then said, "okay, we will get 'L.L.' "

Riley and the others went to L.L.'s home, but L.L. did not answer his door so they left. Carolyn Henry was nearby in her father's automobile. Riley and the others got into Henry's car and Riley proceeded to drive the car to some convenience stores and then towards Tonopah, Nevada. Riley apparently held the shotgun for most of this trip, but Darrell Lee Jackson and Kim Johnson also handled it and, at one point, Jackson allegedly "had" the gun on Leotis Gordon.

---

[1] At the penalty phase hearing, Gordon testified as follows:

A. I said, "why rob 'Ramrod?' 'Ramrod' didn't have nothing. You should have robbed the guy he was working for." He said, "who was he working for?" I said, "I am not sure, but I think Elroy." And that led to him thinking about Elroy.

Eventually, Riley and the others returned to Las Vegas. While Riley left the group to visit an individual named Andy, Carolyn Henry's "god brother" came upon the scene and told those remaining in the car to get out. Riley returned to the group at this time, but did nothing to stop the departure of the others.

Billy Ray Riley and Kim Johnson left together and walked out into the desert where Riley hid the shotgun under some boards. Thereafter, the two were arrested and Johnson led the police to the shotgun.

Riley was tried before a jury and convicted of robbery with the use of a deadly weapon and first degree murder with the use of a deadly weapon.[2] After a penalty phase hearing, the district court sentenced Riley to two consecutive terms of life without the possibility of parole and to a sentence of death. This appeal followed.

### GUILT PHASE ISSUES

Riley assigns error to the district court's refusal to allow a bench trial in this case. He also contends there was insufficient evidence produced at trial to support his convictions, and he argues that the prosecutor committed prejudicial misconduct during the proceedings. Finally, Riley asserts the district court erred in instructing the jury. We will assess the merits of each of these assignments of error separately.

### A.  Request to Waive Trial by Jury.

Prior to trial, Riley asked the court for a bench trial; however, the court refused this request because the State would not stipulate to a non-jury trial. In Nevada, a criminal defendant cannot waive his right to a jury trial unless the district court and the prosecutor consent to the waiver. NRS 175.011(1) provides:

> In a district court, cases required to be tried by jury must be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the state. A defendant who pleads not guilty to the charge of a capital offense must be tried by jury.

Riley does not challenge the constitutionality of that portion of NRS 175.011(1), which requires consent from the court and the prosecutor before a criminal defendant can waive the right to a jury trial; rather, Riley argues his convictions and sentences should be reversed because the State's decision not to stipulate to a non-jury trial was based upon an "improper consideration," to

---

[2]According to appellant Riley, the district attorney has either dismissed existing charges or has refused to press charges against any of the other individuals who were in the home at the time of the shooting.

wit: the prosecutor did not want to afford Riley an opportunity to challenge the constitutionality of mandatory jury trials in capital cases under NRS 175.011(1).[3] We should note at this juncture that the record does not indicate why the prosecutor would not stipulate to a non-jury trial. In any event, we reject Riley's contentions on this issue.

A criminal defendant has the constitutional right to a trial by an impartial jury, but he does not have the right to compel a bench trial. Rains v. State, 83 Nev. 58, 60, 422 P.2d 541, 542 (1967). *See also* Singer v. United States, 380 U.S. 24 (1965). The State was within its rights when it refused to stipulate to Riley's request for a non-jury trial.[4]

### B.    Sufficiency of the Evidence.

Next, in assessing the sufficiency of a jury's conclusions regarding issues of fact in a criminal action, this court is constrained to view the facts in a manner most favorable to the State; thus, this court asks whether any rational trier of fact could have found the elements of the crime involved beyond a reasonable doubt. Koza v. State, 100 Nev. 245, 250, 681 P.2d 44, 47 (1984). Riley argues there was insufficient evidence produced at trial to support his guilty convictions. We disagree.

First, it is uncontradicted that the murder weapon belonged to Riley and that Riley brought the weapon to Leotis Gordon's home on the day in question. Darrell Lee Jackson testified at trial that he witnessed Riley kill Ramrod Bollin with the sawed-off shotgun.[5] Kim Johnson testified that after the shooting, she saw Riley

[3]In support of this contention, Riley cites Commonwealth v. Maxwell, 459 A.2d 362 (Penn. 1983). In *Maxwell,* the Pennsylvania Superior Court reversed a conviction on two counts of robbery because the trial court refused to allow the defendant to waive the right to a jury trial. The Pennsylvania court concluded the refusal was based upon an improper consideration—the trial judge was afraid his courtroom might sit empty for a week if the request to waive a jury trial was granted. *Id.* at 364-365.

[4]We should also note that this court has not adopted the "improper consideration" doctrine espoused by Riley, and even if it did, the State's desire to avoid issues otherwise not in contention would not constitute an improper consideration.

[5]Riley asks this court to reject Darrell Lee Jackson's testimony, asserting Jackson testified against Riley because it was Jackson who actually murdered the victim; however, we conclude there is substantial evidence in the record to support the jury's verdict to the contrary. *See Koza, supra.* Further, we conclude there is no evidence in the record—other than the fact that Jackson was in the room at the time of the murder, to indicate Jackson killed Ramrod Bollin.

cradling his gun while Ramrod Bollin was "sitting" on the dresser with the gunshot wound in his chest.[6] Riley seemed to have a motive: he was angry at drug dealers, and evinced an inclination to rob them because they were not treating him fairly. The evidence further indicates that Riley's acts were premeditated: Riley discussed what he was going to do to the victim before killing him, and allowed Ramrod Bollin to take one last "hit" of cocaine before he was shot. Finally, Riley generally maintained control of the murder weapon and hid it in the desert after it was used to kill Ramrod Bollin. We conclude there was ample evidence produced at the trial to support Riley's convictions.[7]

### C. Statements of the Prosecutor.

Next, Riley argues the prosecutor misstated facts in his opening statements that were not shown at the subsequent trial. Riley also assigns error to misstatements of fact made by the prosecutor during closing arguments and contends the prosecutor maligned defense counsel's credibility during summations.

1. *Misstatements of fact.* In general, the district attorney has a duty to refrain from stating facts in his opening statement that he cannot prove at trial. Garner v. State, 78 Nev. 366, 374 P.2d 525 (1962); State v. Olivieri, 49 Nev. 75, 78, 236 P. 1100, 1101 (1925). In his opening statements, the prosecutor told the jury

---

[6]We conclude this is significant: the medical examiner testified that Ramrod Bollin's heart was destroyed when he was shot, and that Bollin would have lapsed into unconsciousness within twelve to fifteen seconds thereafter. The fact that Ramrod Bollin was still sitting up and clutching his chest when Kim Johnson came into the room would indicate that Riley was holding the murder weapon within twelve to fifteen seconds after the shooting.

[7]Nonetheless, Riley argues he could not have possibly killed Ramrod Bollin. At trial, Jackson testified that Riley was sitting on the bed with the gun at his midsection when he discharged the weapon. Ramrod Bollin was sitting some inches higher on the dresser and the gunshot pellets entered his chest, slightly to the left, a few inches above the nipple. The gunshot blast did not exit through Ramrod Bollin's back. Riley argues these facts mandate a finding that the trajectory of the wound through the victim's body followed an upward angle; however, the medical examiner testified that the trajectory ran essentially in a horizontal direction through the victim's body (if the victim was in a standing position).

The State argues that if Ramrod Bollin was leaning forward and to his right, the trajectory of the wound through Bollin's body would be consistent with Jackson's testimony. We have carefully considered the facts presented in the entire record and the reasonable inferences drawn therefrom. We cannot conclude that the evidence compels a finding that Riley could not have murdered Ramrod Bollin; rather, the evidence in the record indicates the contrary beyond a reasonable doubt.

that Kim Johnson was in the hallway heading towards the bedroom when she heard the shotgun discharge its pellets. At trial, Kim Johnson testified that she was in the kitchen, not in the hallway, when she heard the gunshot. Also, the prosecutor told the jurors that Kim Johnson saw Riley *standing* with the shotgun when she entered the room; however at trial, Kim Johnson told the jury Riley was *sitting* on the bed with the shotgun when she entered the room. Further, in his opening statements, the prosecutor asserted Riley led everyone out of the house at gunpoint; however, the evidence produced at trial indicated Riley only led Leotis Gordon out of the house at gunpoint.

Likewise, in his summations, the prosecutor argued the medical examiner had testified that it was not possible, with any degree of scientific certainty, to analyze the trajectory of the wound through the victim's body; we could not find such testimony in our review of the record. Therefore, the prosecutor did misstate certain facts in opening statements and summation arguments.

2. *Disparaging remarks.* It is also inappropriate for a prosecutor to make disparaging remarks pertaining to defense counsel's ability to carry out the required functions of an attorney. McGuire v. State, 100 Nev. 153, 157-158, 677 P.2d 1060, 1064 (1984). Riley argues the prosecutor disparaged defense counsel during closing arguments when the prosecutor, in apparent disagreement with defense counsel's recitation of the facts, told the jury that defense counsel had taken facts out of context and was ''making stuff up''.

3. *Harmless error.* Taken as a whole, we do not believe the preceding misstatements of fact and comments of the prosecutor warrant a reversal of Riley's conviction. In Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988), we reasoned that if a guilty verdict was free from doubt, even aggravated prosecutorial remarks will not justify reversal. *Id.* at 107, 754 P.2d at 837. Despite Riley's contentions to the contrary, we find overwhelming evidence in the record to support the jury's verdicts in this case. Given the strength of the evidence presented by the State at the trial, we hold that the prosecutor's conduct does not warrant a reversal of those verdicts.

D. Guilt Phase Jury Instructions.

Next, Riley argues the district court improperly gave a jury instruction at the conclusion of the guilt phase proceedings. He

also argues the district court erred when it refused to give an instruction proffered by the defense.

1. *Guilt Phase Jury Instruction No. 19.* Riley assigns error to the statutory reasonable doubt instruction that was given to the jury in Jury Instruction No. 19, asserting the same to be unconstitutional under the holding of Cage v. Louisiana, 111 S.Ct. 328 (1990). *See* NRS 175.211. We have recently ruled otherwise, however, in our decision styled Lord v. State, 107 Nev. 28, 806 P.2d 548 (1991). Accordingly, we reject appellant's contentions on this issue.

2. *Appellant's Proposed Jury Instruction.* A criminal defendant is entitled to a jury instruction if the instruction goes to the defendant's theory of the case and is supported by some evidence produced at trial, no matter how weak or even incredible the evidence appears to be. Alder v. State, 95 Nev. 339, 594 P.2d 725 (1979); Hooper v. State, 95 Nev. 924, 604 P.2d 115 (1979); Froggatt v. State, 86 Nev. 267, 467 P.2d 1011 (1970). Riley argues Darrell Lee Jackson murdered Ramrod Bollin and then quickly handed the shotgun to Riley who was seen holding the weapon within seconds after Ramrod Bollin was shot.

In light of this theory, Riley argues the district court improperly rejected the following instruction proffered by the defense:

> If you have a reasonable doubt as to whether defendant himself personally shot the victim, you must find the defendant not guilty of murder.

We conclude Riley's contentions on this issue are without merit.

First, this proffered jury instruction is an incorrect statement of the law. A homicide committed in the commission of a robbery is, by statute, first degree murder. NRS 200.030(1)(b). The homicide in this case was committed in the commission of a robbery; therefore, Riley could be convicted of first degree murder whether he shot the victim or not.

Second, there was no evidence produced at the trial to support a defense theory that Darrell Lee Jackson fired the shotgun pellets into Ramrod Bollin's chest. Therefore, the district court properly rejected this instruction.

## PENALTY PHASE ISSUES

Next, Riley argues that the district court erred in giving, and refusing to give, various instructions at the conclusion of the penalty phase hearings. Riley also contends his sentence of death

should be overturned because of statements made by the prosecutor during penalty phase summations.

### A. Penalty Phase Jury Instructions.

First, Riley assigns error to four penalty phase instructions given to the jury. He also argues the district court improperly rejected another.

1. *Penalty Phase Jury Instruction No. 7.* The district court gave Jury Instruction No. 7 at the conclusion of the penalty phase. This instruction told the jury:

> In your deliberation you may not discuss or consider the subject of guilt or innocence of the defendant, as that issue has already been decided. Your duty is confined to a determination of the punishment to be imposed.

Riley argues this instruction was prejudicial because it precluded the jury from weighing the evidence of guilt as a possible mitigating factor. We disagree.

A penalty hearing in a capital case is conducted *after* a defendant is found guilty of first degree murder. NRS 175.552. The issue of guilt decided, it should not be addressed again by the jury. Further, while the jury was not at liberty to reevaluate their guilty verdicts, they were nonetheless instructed that they could consider the evidence produced at trial in deciding whether the death penalty was appropriate.[8] Accordingly, the district court did not err when it gave Jury Instruction No. 7 at the conclusion of the penalty phase hearing.

2. *Penalty Phase Jury Instruction No. 24.* Next, Riley argues the district court erred when it gave Jury Instruction No. 24, which informed the jury that "[a] verdict may never be influenced by sympathy. . . ." Specifically, Riley argues this instruction violated his Eighth Amendment rights because it undermined the jury's consideration of mitigating evidence. We disagree.

This court has previously ruled that it is not error to instruct the jury not to be influenced by sympathy if the court also instructs the jury to consider mitigating circumstances. Hogan v.

---

[8]Jury Instruction No. 4 informed the jury as follows:

> The jury is instructed that in determining the appropriate penalty to be imposed in this case that it may consider all evidence introduced at both the penalty hearing phase of these proceedings and at the trial of this matter.

State, 103 Nev. 21, 732 P.2d 422 (1987), *cert. denied* 484 U.S. 872 (1987). *See also* Biondi v. State, 101 Nev. 252, 699 P.2d 1062 (1985); Nevius v. State, 101 Nev. 238, 699 P.2d 1053 (1985). Since the jury in this case was directed to consider mitigating circumstances in deciding the appropriate penalty, the district court did not err when it gave Jury Instruction No. 24 at the conclusion of the penalty phase proceedings.

3. *Penalty Phase Jury Instruction No. 14.* Next, the defendant argues the district court erred when it permitted each of the defendant's prior felony convictions to be alleged as separate aggravating circumstances in Jury Instruction No. 14. Specifically, Riley contends NRS 200.033(2) should be construed by this court to preclude more than one aggravating circumstance, regardless of the number of applicable felonies previously committed.[9] We disagree.

In general, "[a] defendant's character and record are relevant to the jury's determination of the appropriate sentence for a capital crime." Pellegrini v. State, 104 Nev. 625, 630, 764 P.2d 484, 488 (1988). Accordingly, a murder is aggravated if it is committed by an individual previously convicted of a felony involving the use or threat of violence to the person of another. NRS 200.033(2). Such a conviction evinces a propensity for violence and is relevant to a determination of the appropriate sentence; more than one such conviction is likewise relevant.

Nonetheless, Riley argues NRS 200.033(2) should be construed to only allow one aggravating circumstance, regardless of the number of violent felonies previously committed, because a defendant can only claim one mitigating circumstance for a clean record. Riley further argues the language of NRS 200.033(2) precludes more than one aggravating circumstance. We cannot agree.

There is no logic in a conclusion that an individual who commits numerous violent felonies be categorized with an individual who has only committed one; this rationale could subject persons with less violent character traits to a disproportionate sentence, and it could undermine the goal and policy of NRS 200.033(2). Rather, the logical interpretation of NRS 200.033(2), in light of its underlying purpose, shows a legislative

---

[9]NRS 200.033 provides:

The only circumstances by which murder of the first degree may be aggravated are:

. . . .

2. The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.

intent to allow multiple aggravating circumstances under the statute. Accordingly, if the defendant can be prosecuted for each crime separately, each can be used as an aggravating circumstance. *See, e.g.,* Bennett v. State, 106 Nev. 135, 787 P.2d 797 (1990).

4. *Proposed Penalty Phase Jury Instruction D-1.* At the close of the penalty hearing, Riley proposed an instruction that would have informed the jury that a death sentence is not mandatory, even if aggravating circumstances outweigh mitigating circumstances. *See* NRS 200.030(4)(a); *see also Bennett,* 106 Nev. at 144, 787 P.2d at 803. Riley contends he was unfairly prejudiced by the district court's election not to give his proffered jury instruction. We disagree.

Riley's proffered instruction was consistent with our prior rulings; nonetheless, a defendant is not entitled to an instruction when the law therein is substantially covered by another instruction given to the jury. Ford v. State, 99 Nev. 209, 660 P.2d 992 (1983). Jury Instruction No. 12 informed the jury as follows:

> The jury *may* impose a sentence of death only it it finds an aggravating circumstance has been established beyond a reasonable doubt and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstances found.
>
> Otherwise, the punishment imposed shall be imprisonment in the State Prison for life with or without the possibility of parole.

(Emphasis added.) While "may" can be interpreted to mean "shall," if the context of the word requires as much, generally the word "may" is not to be construed to create a requirement, but rather, is construed to signify the ability to choose or the power to act. *See* Gyler v. Mission Insurance Company, 514 P.2d 1219, 1220 (Cal. 1973).

We conclude the word "may" in the context of Jury Instruction No. 12 would be commonly understood by reasonable jurors as a permissive word that does not mandate a particular action. Thus, we rule that the jury in this case was properly informed that the imposition of a death sentence was not compulsory, even if aggravating circumstances outweighed mitigating circumstances.

### B. Statements of the Prosecutor.

In Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985), we concluded that certain comments made by a prosecutor in favor of a death penalty, particularly comments that address unknown future events, the costs of confinement, or the prosecutor's per-

sonal belief that the defendant deserves to die, were inappropriate. "Comments of this sort divert the jury's attention from its proper purpose, which is the determination of the proper sentence for the defendant before them, based upon his own past conduct." *Id.* at 478, 705 P.2d at 1129. Riley argues his death sentence should be reversed because of statements made by the prosecutor during penalty phase summations to the jury. We disagree.

1. *Comments made without objection.* During summations, the prosecutor discussed Riley's prior conviction for battery with use of a deadly weapon. The prosecutor told the jury, "[i]n June of 1989 this defendant armed himself with a fence post, a metal fence post three and a half feet long and he beat a young woman with that fence post so *severely* that . . . a jury . . . convicted him of battery with a deadly weapon." (Emphasis added.) Riley argues the prosecutor should not have characterized the beating as a severe beating because the victim was not hurt badly.[10] The prosecutor also referred to Riley as a "killing machine" in summation arguments; Riley argues this was improper as well. Finally, Riley argues that the prosecutor improperly appealed to the jury's sense of community responsibility when he said, "[u]nder these circumstances any juror in serving their community can only return one just punishment: the death penalty."

As a general rule, "to entitle a defendant to have improper remarks of counsel considered on appeal, objections must be made to them at the time, and the court must be required to rule upon the objection, to admonish counsel, and instruct the jury." State v. Hunter, 48 Nev. 358, 367, 232 P. 778, 781 (1925). *See also* Mears v. State, 83 Nev. 3, 442 P.2d 230 (1967); State v. Fitch, 65 Nev. 668, 200 P.2d 991 (1948). First, we note that defense counsel failed to object to any of the preceding comments. Therefore, we are not required to address the merits of appellant's belatedly raised contentions on this issue.

·Nonetheless, we have carefully reviewed the prosecutor's remarks. We conclude that none are so inflammatory as to render Riley's death sentence fundamentally unfair. *See, e.g., Flanagan,* 104 Nev. at 112, 754 P.2d at 840.

2. *Inference that Riley might continue to be a threat while incarcerated.* Finally, Riley assigns error to the following statement made by the prosecutor during his penalty phase summation:

---

[10]We should note that our review of the record on this issue leads us to conclude that the beating was, in fact, properly characterized as a severe beating.

Let me direct myself specifically to some comments made by counsel. I will start with Mr. Martin.

He said something like life without is appropriate because it means just that and he would never be a threat to anyone again. I want you to use your common sense. Trials would take forever if I proved everything. Prisons have other prisoners. Prisons have prison guards. Prisons have civilian employees, doctors as yourself—

MR. DAHL: I'm going to object.

THE COURT: Sustain the objection.

Riley argues the preceding constitutes reversible error because it implies Riley might still be a threat while incarcerated. It is unclear what the prosecutor was about to say prior to the objection, but even if the jurors interpreted the prosecutor's comment to indicate Riley could pose a threat if he were incarcerated, we cannot find reversible error.

Generally, arguments concerning improbable rehabilitation and future killings are improper where the predictions are purely speculative. *See, e.g., Collier,* 101 Nev. at 478, 705 P.2d at 1129; *see also Flanagan,* 104 Nev. at 108-109, 754 P.2d at 837-838 (1988). However, "[w]hen there is evidence . . . of a defendant's past conduct which supports a reasonable inference that even incarceration will not deter the defendant from endangering others' lives, a prosecutor is entitled to ask the jury to draw that inference." Haberstroh v. State, 105 Nev. 739, 741, 782 P.2d 1343, 1344 (1989). Riley's past behavior indicates a violent character that could support a reasonable inference that he might pose a threat to fellow inmates while incarcerated.

## CONCLUSION

In sum, upon careful review of the record we conclude that Riley's sentence of death was not the result of passion, prejudice or any arbitrary factor, nor was the sentence excessive in light of the crime committed and the individual characteristics and background of the defendant. Therefore, we affirm in all respects the judgments of conviction and sentences imposed thereon.