BILLY RAY RILEY, Appellant, *v.* THE
STATE OF NEVADA, Respondent.

No. 23621

July 7, 1994                                    878 P.2d 272

[Rehearing denied August 12, 1994]

*Cal J. Potter,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

# OPINION

*Per Curiam:*

## INTRODUCTION

Appellant Billy Ray Riley (Riley) was convicted after a jury trial of one count of first degree murder and one count of robbery, both with use of a deadly weapon. The jury found five aggravating circumstances at the penalty phase, with no mitigating circumstances sufficient to outweigh them, and sentenced Riley to death for the murder. The judge sentenced Riley, as an habitual criminal, to life without possibility of parole for the robbery.

Riley appealed the judgment of conviction to this court, on

several grounds.[1] This court rejected all of Riley's arguments, and affirmed the sentences, including the sentence of death. *See* Riley v. State, 107 Nev. 205, 208, 808 P.2d 551, 552 (1991).

At the time Riley was pursuing his direct appeal to this court, he was also a member of a class action lawsuit, filed in federal district court, naming as defendants this court and each of the individual justices. *See* Riley v. Nevada Supreme Court, 763 F. Supp. 446 (D. Nev. 1991). The suit alleged that the portion of SCR 250 requiring strict adherence to an expedited briefing schedule in capital cases was unconstitutional, and the plaintiffs in that suit sought to enjoin this court from enforcing those rules. The federal district court judge issued a preliminary injunction enjoining the enforcement of the briefing schedule.[2]

After the resolution of his direct appeal, Riley filed this petition for post-conviction relief in district court, alleging ineffective assistance of counsel at both the trial level and on appeal. Riley also alleged that he was denied "actual assistance of counsel" because of this court's bias stemming from the federal suit, and he alleged that his right to a fair and impartial jury was denied when the district court judge, on his own motion, excused a potential juror. The district court judge denied Riley's petition after considering Riley's arguments and the evidence elicited at a post-conviction evidentiary hearing. We find Riley's claims to be without merit, and affirm the district court order denying his petition for post-conviction relief.

## FACTS

Riley was convicted after a jury trial of the first degree murder and robbery of Albert "Ramrod" Bollin (Bollin). On the morning of October 1, 1989, Bollin and Darrell Lee Jackson (Jackson) went to the home of Leotis Gordon (Gordon). Riley was at

---

[1]Riley argued that there was insufficient evidence to support the verdict. He also challenged the district court's refusal to order a bench trial and the court's refusal to instruct the jury on his theory of the case during the guilt phase. Riley also challenged instructions given during the penalty phase, and he alleged prosecutorial misconduct during both the guilt and penalty phases.

[2]The relevant portions of SCR 250 have since been revised, and the federal suit has been dismissed. *See* SCR 250; Riley v. Nevada Supreme Court, No. CV-N-90-451-ECR (D. Nev. Order Dismissing Cause of Action October 14, 1993).

In the meantime, Riley's counsel on direct appeal consistently failed to meet the deadlines of the briefing schedule set forth in the rules and in several orders issued by this court, and this court issued an opinion discussing counsel's conduct, but declined to impose sanctions. *See* Riley v. State, 107 Nev. 220, 808 P.2d 560 (1991) (YOUNG and MOWBRAY, JJ. dissenting).

Gordon's home, as were Gordon and Kim Johnson (Johnson), Riley's girlfriend. Bollin lived in a room at Gordon's house.

Riley met Bollin and Jackson at the door, and asked Bollin if Bollin had any drugs. Bollin, Jackson and Riley then went into a bedroom. Bollin and Jackson began to count their money. Jackson testified that Riley became emotional and angry about the treatment he had been receiving from drug dealers. Riley told the men he was going to start robbing drug dealers who mistreated him. At this point, Bollin and Jackson gave Riley some rock cocaine, and Riley smoked it.

Jackson further testified as follows: Bollin took a shower. While Bollin was in the shower Riley asked Jackson about Bollin's drugs and money. Bollin went to his bedroom after he finished his shower, and Riley followed him in. Bollin sat on a dresser facing Riley, who sat on the bed. Jackson entered the room and stood near Bollin toward the middle of the dresser. Riley was pointing his .410 caliber sawed-off shotgun at Bollin.

Riley asked Bollin who the drugs belonged to and Bollin said, "[I]t's none [sic] mine." Riley then said, "[I]t's mine now." After this exchange Bollin said, "[N]o, dude. You know you're going to have to kill me first." Riley then asked Bollin if Bollin was "ready to die." Bollin responded, "[A]ll right. Let me finish taking this hit." After Bollin smoked some cocaine, he put down the pipe, and Riley asked him again if he was ready to die. Bollin said, "Yeah" and Riley shot Bollin in the chest.

Johnson testified that she was in the kitchen when she heard Bollin say, "[I]f you're going to kill me, just kill me." She then heard the flick of a cigarette lighter, and shortly thereafter a gunshot. Johnson immediately walked to the room and saw Riley sitting on the bed, holding his shotgun. Bollin was upright on the dresser clutching his chest. Johnson then heard Bollin call out "Leo" (Gordon). Johnson walked to Gordon's room and Gordon asked her what happened. Riley and Jackson then came into Gordon's room.

Gordon testified that he was in his room sleeping when he heard the gunshot. Gordon heard someone say, "Leo, run." Gordon asked, "What's going on here?" He then tried to exit through his window, but stopped when Riley entered the room and told Gordon to "just hold it." Riley then told Johnson to get shotgun shells, and told Jackson to take Bollin's money and drugs. Riley was holding the gun, but asked Jackson to hold the gun shortly thereafter.

Gordon asked Riley why he would kill Bollin, because Bollin didn't have money. Gordon then asked why Riley didn't "get 'L.L.' He's the guy that has [some money]." Riley, Jackson,

Gordon and Johnson then went together to L.L.'s home. L.L. was not there and Riley and the others took a car belonging to Carolyn Henry (Henry). They also took Henry with them.

Riley drove the car to several stores to buy gas, food and shotgun cartridges, and then drove toward Tonopah, Nevada. During most of this trip Riley held the gun, but he also handed it to Johnson and Jackson. The group returned to Las Vegas, and Riley and Johnson hid the gun under some boards in the desert. Riley and Johnson were later arrested and Johnson led police to the gun.

Riley was convicted of the first degree murder and robbery of Bollin, both with use of a deadly weapon. The jury found five aggravating circumstances: that the murder was committed in an attempt to commit robbery or while committing robbery, and that Riley had three prior robbery convictions and one prior armed robbery conviction. The jury fixed the penalty at death for the murder and the judge sentenced Riley, as an habitual criminal, to life without possibility of parole for the robbery.

After his direct appeal, Riley filed a petition for post-conviction relief. In his petition, Riley alleged ineffective assistance of counsel, and that he was denied "actual assistance of counsel" and a fair and impartial jury. Specifically, Riley alleged six bases for ineffective assistance of counsel: (1) that trial counsel failed to adequately investigate by (a) failing to hire, consult or call a ballistics expert to testify about the trajectory of the shotgun blast that killed the victim, and (b) failing to investigate a hearsay statement allegedly exculpating Riley; (2) that trial counsel failed to offer adequate and available documentary and testimonial evidence tending to show mitigating factors at the penalty phase; (3) that trial counsel failed to object to improper statements of the prosecutor and that appellate counsel failed to raise these instances of misconduct on direct appeal; (4) that trial counsel failed to request an accomplice instruction or other instruction addressing the credibility of the state's witnesses; (5) that trial counsel failed to request a theory of the case instruction; and (6) that trial counsel failed to object to the improper striking of a juror by the trial court during voir dire of the jury venire.

Riley's claim that he was denied actual assistance of counsel on appeal was premised on the argument that the Justices of this court denied his direct appeal because of bias against Riley and his counsel for filing the class action lawsuit in federal court challenging SCR 250. Finally, Riley alleged he was denied a fair and impartial jury when the trial judge "improperly and prematurely" excused a potential juror who allegedly expressed misgivings about the death penalty.

A post-conviction evidentiary hearing was held March 23,

1992. Susie Butler (Butler), Riley's mother, testified at the hearing. Butler testified that she overheard Jackson and two people talking. She allegedly heard one man say, "[M]an, I heard they railroaded Billy Ray [Riley]." Jackson allegedly responded, "[Y]es, they did. But I was the one that got his last breath." Butler claimed that Riley's trial counsel, deputy public defender Steven J. Dahl (Dahl), never let her discuss this conversation. Butler admitted at the hearing, however, that she only spoke to Dahl "one time," during which time she gave background information on Riley. She claimed that she "told [Dahl] I had some things that I [wanted] him to know, but I never did get around to telling him because he didn't call me back."[3]

Dahl testified that Butler never tried to tell him about this incident before or during the trial. Dahl claimed that Riley, after the penalty phase, suggested that Dahl contact Butler because Butler told Riley about the conversation. Dahl testified that he contacted Butler twice, but Butler expressed doubt about the people she heard, and she failed to call Dahl back.

Riley also called Jack Jurasky, M.D. (Jurasky), a psychologist who had analyzed Riley's competency to stand trial. Jurasky had conducted only this pre-trial evaluation on Riley's competence to stand trial; he did not conduct a separate evaluation to discover evidence that could be used in mitigation of the sentence. Jurasky testified at the hearing that Riley grew up in a violent environment, and that an individual exposed to such an environment will often react by becoming violent. He also testified that a person on drugs is often not in full control of his actions. Dahl testified that he had hired two psychiatrists to evaluate Riley. However, he later indicated that he hired only one psychiatrist, Jurasky.

In addition to the foregoing, Dahl testified that he did not consult, hire or call as a witness any ballistics experts. Dahl also testified that his strategy at trial was to argue that Jackson shot Bollin. Dahl based his argument that Jackson shot Bollin on testimony regarding the measurements taken by his investigator and testimony by Johnson, a percipient witness, regarding the position of Bollin. In addition, although Dahl did not testify about this at the evidentiary hearing, a review of the trial transcript shows that Dahl also cross-examined Dr. Sheldon Giles, a forensic pathologist and Clark County Coroner, regarding the possible attitude of shotgun pellets as they entered Bollin. During closing arguments at trial, in order to argue that Jackson, who

---

[3]When asked if she reported the conversation to police, Butler said, "No. I contacted [Dahl], and that's when I told him I would like to talk to him. And he told me he would get back with me, but he didn't." She later admitted that she "never did get back with him." On cross, she admitted she never told the police, Dahl or the district attorney.

was standing next to Riley, shot Bollin, Dahl claimed that there was "only one direction in this case. That direction is front to back horizontal and left to right."

Dahl also testified that he believed this court to have been biased against him and Riley. Dahl stated that Riley "holds a record for the quickest denial of appeal of a death penalty case in the history of the State of Nevada." Dahl further testified that the state had offered two life sentences without possibility of parole as a plea bargain. After hearing the above evidence at the hearing, the district judge entered Findings of Fact, Conclusions of Law and an Order denying Riley's petition, finding that all of Riley's claims lacked merit. Riley appeals.

## DISCUSSION

Riley claims that he was denied reasonably effective assistance of counsel at trial and on direct appeal, that he was denied "actual assistance of counsel" because of this court's bias and that he was denied his right to a fair and impartial jury, all in violation of the Nevada and United States Constitutions.

An indigent defendant possesses a constitutional right to reasonably effective assistance of counsel at trial and on appeal. Strickland v. Washington, 466 U.S. 668, 687 (1984) (trial); Evitts v. Lucey, 469 U.S. 387, 391 (1985) (appeal); Warden v. Lyons, 100 Nev. 430, 432, 683 P.2d 504, 505 (1984), cert. denied, 471 U.S. 1004 (1985). To state a claim of ineffective assistance of counsel sufficient to invalidate a judgment of conviction, a convicted defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and that he was prejudiced as a result of counsel's performance. Strickland, 466 U.S. at 687-88, 692. Prejudice is demonstrated where counsel's errors were so severe that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of trial. Id. The defendant carries the affirmative burden of establishing prejudice. 466 U.S. at 693.

### Trial counsel's failure to investigate adequately

Riley challenges Dahl's failure to investigate statements, reported by Butler, that allegedly indicated that Jackson participated in the killing of Bollin. He argues that it was ineffective representation for Dahl to have failed to investigate this statement

and to present evidence regarding this statement at trial. Butler testified that she heard Jackson talking with two other people, and that an unidentified man stated, "[M]an, I heard they railroaded Billy Ray [Riley]." Jackson then allegedly responded, "[Y]es, they did. But I was the one that got his last breath."

The trial judge found that

> [P]etitioner's mother, Susie Butler, has an obvious bias in these proceedings. The Court finds that her testimony is in conflict with the testimony of the defendant's trial counsel Steven J. Dahl. The Court finds Susie Butler to be an incredible witness and Steven Dahl to be a credible witness. Therefore, the Court concludes that Susie Butler never informed Steven Dahl before the guilt phase or before the penalty phase that she had overheard Darrell Lee Jackson admit to the commission of the murder.

Although it is true that "[t]he question of whether a defendant has received ineffective assistance of counsel at trial in violation of the Sixth Amendment is a mixed question of law and fact and . . . thus subject to independent review," State v. Love, 109 Nev. 1136, 1138, 865 P.2d 322, 323 (1993), it is also true that purely factual findings of an inferior tribunal regarding a claim of ineffective assistance are entitled to deference on subsequent review of that tribunal's decision. See Strickland, 466 U.S. at 698. A review of Butler's testimony at the evidentiary hearing reveals that the district court's factual finding is supported by substantial evidence and is not clearly wrong. Butler was evasive and contradicted herself. In addition, she admitted that she only spoke to Dahl "one time," and that she made no effort to communicate any information about the alleged conversation to the police, Dahl's co-counsel, or the district attorney. Moreover, Dahl testified that Riley told Dahl to contact Butler, and that Butler was unsure of the story and never called him back. Thus, it appears that the district judge, after weighing credibility, reasonably concluded that Butler never attempted to communicate the conversation to Dahl. As a result, it was not ineffective for Dahl to have failed to have investigated it.[4]

---

[4]Riley presented a memorandum of supplemental legal authority to this court after this case had been submitted for decision, wherein he cited State v. Love, 109 Nev. 1136, 865 P.2d 322 (1993). In Love, this court held that the failure to contact and interview potential alibi witnesses, of whom counsel had been made aware, and the subsequent failure to call such witnesses at trial, constituted ineffective assistance of counsel. 109 Nev. at 1140, 865 P.2d at 324. Love, however, does not change the result on this issue in the instant case. It is evident from the record of the evidentiary

648

▮▮▮▮▮▮

Riley also argues that Dahl provided ineffective representation at trial by failing to hire, consult or call a ballistics expert to substantiate Riley's theory that Jackson, not Riley, shot Bollin. To support this theory Dahl showed the jury a diagram showing the measurements of the room and the positions of the bed, dresser and victim. Dahl had used the measurements recorded by police investigators, and he had hired a defense investigator to take measurements at Gordon's house.

The chart was used as demonstrative evidence only, and was not admitted into evidence. Using the chart during closing, counsel argued that based upon his measurements, and those of police investigators, it was highly unlikely that the shot that killed Bollin was fired from the spot on the bed where Riley sat. Therefore, Dahl argued, it must have been Jackson who shot Bollin.

Riley argues that an expert would have appeared more credible to the jury and would have substantiated the claim that the gun could not have been fired from where Riley sat. Therefore, he argues, Dahl's error in failing to consult, hire and call an expert was so deficient that the conviction must be reversed.

▮▮▮▮▮▮

Prejudice in an ineffective assistance of counsel claim is shown when the reliability of the jury's verdict is in doubt. *Strickland,* 466 U.S. at 687. Reliability is in doubt where the defendant can show that, but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. *See Love,* 109 Nev. at 1139, 865 P.2d at 323; *Strickland,* 466 U.S. at 694.

In the instant case, Riley's theory that Jackson shot Bollin does not appear credible, and, given the evidence elicited at trial, the reliability of the jury's verdict does not appear to be in doubt. The testimony at trial established that Johnson arrived at the door of the bedroom within seconds of hearing a gunshot and saw Riley on the bed holding the gun and Bollin clutching his chest. The gun belonged to Riley, and he had been holding it for the several minutes prior to the shooting. In addition, Jackson's story regarding Riley's motives and actions (that he was agitated, crying and wanted to rob drug dealers, who he thought had ripped him off) is partially corroborated by statements made by Johnson regarding what she heard and saw.

---

hearing that as a factual matter Dahl was not apprised, prior to trial, of the existence of Jackson's hearsay statement allegedly inculpating Jackson. As a result, it was not ineffective for Dahl to have failed to investigate a matter of which he was unaware.

Thus, even if counsel's conduct fell below the level of care expected of a competent defense attorney, Riley has nevertheless failed to show that the jury's verdict is unreliable, and that he was prejudiced. We do not reach whether the failure to call an expert was deficient, however, as Riley's argument that expert witness testimony was "crucial" is highly speculative. Riley failed to meet his burden—to present an argument demonstrating the type and strength of evidence that might have been presented, and that there exists a reasonable probability that presentation of the evidence would have resulted in a different outcome at trial. We must hold that Riley's claim that Dahl was ineffective for failing to hire or consult an expert on ballistics is without merit, as he has failed to articulate prejudice in a persuasive manner.

*Trial counsel's failure to offer adequate and available documentary and testimonial evidence at the penalty phase*

Riley contends that trial counsel failed to produce and offer available mitigating evidence, both documentary and testimonial, at the penalty phase of his trial. He argues that this was not reasonably effective assistance in a capital case.

The only mitigating evidence offered and admitted was a parole board and referral report dated December 11, 1969 (the report). This report was compiled as part of the records regarding Riley's parole release for an earlier offense. The report tended to show that Riley strived for achievement and discipline in a structured environment, notably prison, and Dahl argued this point. Thus, it was evidence that possibly could have convinced the jury that prison was an acceptable alternative to the death penalty. The report also included a statement on Riley's upbringing in a violent atmosphere, and counsel addressed this in the penalty phase closing argument.

Riley contends, however, that Dahl should have inquired further into Riley's psychological traits and history after Dahl reviewed a pre-trial psychiatric evaluation (the pre-trial evaluation) conducted by a Dr. Jurasky. Dahl had hired Jurasky to conduct the pre-trial evaluation to determine Riley's competence to stand trial. The pre-trial evaluation contained negative information about Riley's criminal history, but also discussed some of Riley's positive qualities and described the violent atmosphere of Riley's youth.[5] Riley concedes the evaluation was "limited to [the

---

[5]Riley does not claim that Dahl should have introduced the evaluation. Dahl testified that he decided not to introduce the evaluation because he considered it to be damaging to Riley's interests, inasmuch as it contained numerous references to Riley's extensive criminal record.

issue of] competence,'' but argues that it ''should have prompted further investigation into Riley's overall mental/emotional state and personal history.''[6]

If mental health records indicate that a psychological evaluation may produce favorable reports sufficient to mitigate a sentence of death, counsel's failure to request such an evaluation is both inadequate and prejudicial. *See, e.g.,* Deutscher v. Whitley, 946 F.2d 1443, 1446 (9th Cir. 1991), *vacated,* 113 S.Ct. 367 (1992), *aff'd sub nom.* Deutscher v. Angelone, 16 F.3d 981, 984 (9th Cir. 1994); Evans v. Lewis, 855 F.2d 631, 636-39 (9th Cir. 1988).[7]

In *Deutscher,* the court found ineffective assistance where counsel failed to investigate and offer mental health records showing defendant's history of schizophrenia, pathological intoxication, and organic brain damage. 946 F.2d at 1446. In addition, the court focused on counsel's failure to inquire into the defendant's commitments to mental institutions. *Id.*

In *Evans,* counsel's failure to investigate defendant's mental condition for the purpose of presenting evidence in mitigation of a death sentence was ineffective where the defendant had a prior diagnosis of schizophrenia that could have shown he had an impaired mental state at the time of the crime. 855 F.2d at 636.

The pre-trial evaluation in the instant case does not contain any information approaching the type of indications present in *Deutscher* and *Evans,* namely the existence of particular psychological conditions or disorders that may have shown prior mental disturbance or impaired mental state. The records in the instant case show the existence of industrial head injuries, for which Riley received insurance benefits, and that Riley was admitted to a hospital for psychiatric evaluation at the age of 16.

---

[6]Dahl testified at the evidentiary hearing that he enlisted two psychiatrists to examine Riley. However, he did not explain why he failed to call these psychiatrists at the penalty phase. Dahl later appeared confused about whether he had employed two psychiatrists or just one. On further questioning, it appeared that Dahl had retained just Jurasky, and that he only sought Jurasky's assistance to determine Riley's competence to stand trial. Jurasky did not assist Dahl in analyzing Riley to obtain possible mitigating evidence.

[7]In arguing that Riley cannot show prejudice, the state incorrectly focuses on the quantum of proof at the guilt phase. The state claims that the death penalty may stand because the evidence was ''overwhelming.'' Although it may have been, this is not the proper prejudice inquiry. At the penalty phase, the prejudice inquiry is whether defendant would have received the death penalty in the absence of counsel's unreasonably deficient performance. In the instant case, the inquiry becomes whether Riley would have been sentenced to death had mitigating factors relating to psychological traits and drug abuse been offered.

Although the evaluation indicated a history of extensive drug use, there was no indication in the pre-trial evaluation, conducted to determine psychological fitness to stand trial, that Riley's mental health or physical functioning was affected by such drug use. As a result, we hold that it was not ineffective assistance of counsel, without stronger indications, for Dahl to have failed to order a psychiatric evaluation of Riley based on the information contained in the pre-trial evaluation.[8]

*Trial counsel's failure to object to allegedly improper statements of the prosecutor and appellate counsel's failure to raise these instances of alleged misconduct on direct appeal*

Riley also argues that he was denied reasonably effective assistance of counsel because Dahl failed to object to improper statements made by the prosecutor. Although this court considered and rejected, on Riley's direct appeal, a claim of prosecutorial misconduct, Riley now points to "even more egregious instances of prosecutorial misconduct . . . during the guilt phase."

Riley claims that the state impermissibly shifted the burden of proof at closing when the prosecutor said

[the] drawing that counsel did with all the measurements and the angle and everything, are you wondering what, to yourself, why, you know, some witness like his investigator or some expert witness, even Dr. Green on cross-examination wasn't asked to draw that in front of you? Well, a witness can be cross-examined. A defense attorney who is making stuff up in closing argument can make up anything he wants to.

Riley fails to specify how this statement "shifted the burden of proof" to him. The prosecutor was commenting on the chart used as demonstrative evidence. However, the prosecutor did not comment on Riley's failure to call witnesses, he merely asked why the witnesses who did testify (including the investigator and

[8]The district court judge also found that counsel's failure to call character witnesses was not ineffective. He specifically found that

[T]he defendant refused to assist his trial counsel in preparing or presenting mitigating evidence at the penalty phase. Further, the defendant instructed potential defense penalty phase witnesses who were his family members not to cooperate with his counsel and not to appear and testify at the penalty phase.

This finding is supported in the record and, as a result, counsel's failure to present such witnesses was not ineffective.

forensic pathologist) did not construct the chart or validate it. This was not prosecutorial misconduct. Even if it were, and if failure to object fell below the objective standard of reasonableness, Riley does not persuasively argue that the jury's verdict was unreliable because of this error. Accordingly, this claim is without merit.

Riley also challenges another statement as misconduct. The prosecutor began his closing argument with the statement, "Okay, let me tell you what happened." Riley claims that this was a "verbal wink and nod" that was unfairly prejudicial, in that it was both a "veiled reference to matters not in evidence," and an "improper attempt to superimpose [the prosecutor's] credibility via [his] status as a government attorney . . . ."

This statement is fairly seen as an introduction to the state's version of the case, which differed from Riley's. Thus, the prosecutor was merely indicating that what was to follow was his version of events. This is not improper. So long as matters outside the record were not argued, and so long as the statements following the comment were supported by the testimony, there is no misconduct.

Riley's only support in Nevada case law involved an egregious case in which the prosecutor said, "[W]e, of course, have access to our information that didn't come out in trial and can't present . . . ," and "[W]e have access to things that are not available, so we can't really get into that about what happened before." *See* Schrader v. State, 102 Nev. 64, 65, 714 P.2d 1008, 1008 (1986). The state's comment in this case is not even close to that in *Schrader* and the other cases cited by Riley. *See, e.g.,* United States v. Garza, 608 F.2d 659, 663-64 (5th Cir. 1979) (prosecutor repeatedly "testified" as to witnesses' credibility); United States v. Morris, 568 F.2d 396, 402 (5th Cir. 1978) (same). Accordingly, we do not perceive prosecutorial misconduct from this statement by the prosecutor.

*Trial counsel's failure to request an accomplice instruction or other instruction addressing the credibility of the state's witnesses*

Riley next alleges that Johnson and Jackson were "clearly accomplices" of Riley, and that counsel's failure to request an "accomplice instruction" at the guilt phase of trial was ineffective assistance of counsel. Riley further argues that counsel's failure to request any instruction addressing the credibility of the witnesses as "compensated informants, co-conspirators, and addict witnesses" was ineffective.

Dahl testified at the evidentiary hearing that his only theory of the case was that Jackson, not Riley, shot Bollin. He further testified that asking for an accomplice instruction would have undermined this defense. In this case, the decision not to ask for an accomplice instruction reflects a reasonable tactical choice and such a valid tactical choice is entitled to deference. *See* United States v. Murray, 751 F.2d 1528, 1535 (9th Cir. 1985) (reviewing court not to second-guess legitimate tactical decisions, and counsel's conduct falling within wide range of reasonable professional conduct will not be deemed ineffective), *cert. denied* 474 U.S. 979 (1985). Accordingly, we conclude that this choice was within the range of reasonably effective assistance guaranteed Riley by the Nevada and United States Constitutions.

Moreover, an "accomplice instruction" advises the jury that it should view as suspect incriminating testimony given by those who are liable to prosecution for the identical charged offense as the accused. *See* Ramirez-Garza, 108 Nev. 376, 378, 832 P.2d 392, 392-93 (1992). In this case, the record is wholly devoid of evidence tending to support a theory of joint criminal liability and no evidence supports the conclusion that Jackson or Johnson was liable to prosecution for this offense. Thus, neither Johnson's nor Jackson's testimony was suspect, and, as a result, the factual predicates for invoking the accomplice instruction are absent.

Riley also argues that Dahl should have requested various other instructions addressing the credibility of Johnson, Jackson and Gordon. Specifically, he claims that instructions were warranted because the three were "compensated informants, co-conspirators, and addict witnesses." Riley fails to support his claim that the three were compensated informants. They were merely percipient witnesses, and there is no evidence of record that any of the witnesses at trial were paid or had received a deal in exchange for their testimony. Riley also fails to support his claim that the three were co-conspirators. There is no evidence of record to support a conspiracy theory, or any other theory of joint criminal liability. Finally, Riley advances no "addict witness" instruction that is currently in use in Nevada or elsewhere. The trial judge found that he was "left to speculate as to what instruction should have been given concerning witnesses who might have been drug users who appeared and testified . . . at trial." In addition to the speculative nature of the possible addict instruction, it is noteworthy that both counsel in closing arguments repeatedly emphasized that the witnesses were either on

drugs, or had recently ingested drugs, namely crack cocaine. Riley emphasized this to undermine the witnesses' credibility, the state to admit the negative aspects of its witnesses' backgrounds and factors affecting their ability to perceive and relate the events at issue.

The jury was instructed to use its common sense and to consider the arguments of both counsel in determining credibility and weight of the evidence. Thus, even if there is an appropriate instruction available, which competent counsel might normally request, Riley has failed to produce evidence or arguments to show that the jury's verdict was unreliable because of the failure to proffer such an instruction. As a result, he has failed to show prejudice flowing from the failure to request this instruction.

### Trial counsel's failure to request a theory of the case instruction

Riley argues that he was denied effective assistance of counsel because his trial counsel failed to request a theory of the case instruction. This claim must fail, however, because Dahl did request a "theory of the case instruction," which was rejected by the district judge because it was duplicative and subsumed within other instructions.

Riley's theory of the case was that Jackson, not Riley, shot Bollin. Dahl requested an instruction that read, "If you have a reasonable doubt as to whether the defendant himself personally shot the victim, you must find the defendant not guilty." The district judge rejected the instruction, and Riley maintained on appeal that his conviction should be reversed. This court disagreed. *See Riley,* 107 Nev. at 214, 808 P.2d at 556-57.

As a result, Riley's premise is faulty. Dahl did request the instruction, and cannot be said to have been ineffective based on this ground. Furthermore, as this court rejected Riley's substantive claim, namely that failure to give the instruction required reversal, he cannot show prejudice.

### Trial counsel's failure to object to the improper striking of a juror by the trial court during voir dire

Riley argues that he was denied effective assistance of counsel because Dahl failed to object to the improper striking of a potential juror and because Dahl failed to rehabilitate her after the judge's voir dire questioning indicated she did not have the capacity to serve as a juror. This argument fails on both the adequacy of performance and prejudice prongs.

Riley argues that the judge excused the juror because she

"indicate[d] that the capital nature of the case would cause [her] to be more emotionally involved . . . ." (Citing Adams v. Texas, 448 U.S. 38 (1980).) The district court judge found, however, that the trial judge excused the potential juror because she appeared entirely confused. In fact, the trial judge never asked the juror specifically about her feelings regarding the death penalty, because it was clear that she was confused by the most simple legal concepts.

The entire colloquy with the potential juror, apart from questions designed to elicit background information of a personal nature, consisted of the following:

> Q: Thank you. And do you believe in the presumption of innocence?
> A: Yes.
> Q: Do you presume Mr. Riley to be innocent at this time?
> A: I wouldn't know.
> Q: Well, do you believe him to be innocent under the presumption of innocence?
> A: Yes.
> Q: And is there anything in your background or your upbringing that will prevent you from bringing back a death penalty under the appropriate case?
> A: Pardon me?
> Q: The death penalty?
> A: No.
> Q: Can you do that under the appropriate case?
> A: No.
> Q: You feel you are prejudiced?
> A: No, I am not prejudiced.
> THE COURT: Any objection I excuse [the juror?]
> [COUNSEL]: None, your Honor.

The potential juror contradicted herself numerous times in this short discussion with the judge. The judge then excused her sua sponte, without objection. There is nothing in the record to show that the judge dismissed the potential juror because she indicated she would have any difficulty imposing the death penalty. In fact, she actually answered no to the question whether she had anything in her background or upbringing that would prevent her from imposing the death penalty in the appropriate case. As a result, the district court's finding that the potential juror was "confused as to the nature of the criminal process" is supported by substantial evidence; it was therefore not ineffective for Dahl to have failed to object to the striking of this confused potential juror.

*This court's bias against Riley and his counsel for filing a class action federal lawsuit challenging SCR 250, which requires strict adherence to death penalty briefing schedules*

In addition to Riley's ineffective assistance claims, he argues that he was denied "actual assistance of counsel" on his direct appeal because this court was biased against him and his attorney for filing a class action lawsuit in federal court challenging this court's rule requiring strict adherence to an expedited briefing schedule in capital cases.

Riley cites no case law discussing "actual assistance of counsel," including how such a claim would relate to the alleged bias or prejudice of the court before whom the defendant and counsel appear. Accordingly, he presents no authority for his claim. Although we would be warranted in refusing to consider Riley's claim for those reasons, we briefly discuss this claim.

Riley's claim is, essentially, that his direct appeal was denied because of this court's bias against him. Riley claims that JUSTICE YOUNG's "stinging" dissent, which stated that Dahl should have been sanctioned for his dilatory conduct in failing to meet required and court-ordered deadlines, *see* 107 Nev. at 323-26, is "evidence" of bias against him. Riley also points out that he "holds a record for the quickest denial of appeal of a death penalty case in the history of the State of Nevada."

Reliance on these factors for the conclusion that this court is biased springs from pure speculation and implications that this court will not remain objective in deciding a death penalty case because it is upset with a lawyer for suing the court. Since there is nothing in the record to support these claims, and since Riley has presented no supplemental materials supporting these claims, we must assume that they are without support.

Riley also argues, without further analysis, that "[c]ounsel spent more time and energy fighting the court system than he did in preparing Riley's appeal." To the extent that this is an argument that counsel was therefore without time to represent him effectively on appeal, this argument must fail. This court engaged in an extensive review of the facts and law pertaining to all of Riley's claimed assignments of error. Thus, even if counsel had filed deficient appellate briefs that constituted performance below an objective standard of reasonableness, this court's analysis (the thoroughness of which is evidenced by a complete discussion of each of Riley's claimed points of error) precludes a finding of prejudice resulting from such a deficiency. Accordingly, Riley's claims of bias and ineffective assistance on appeal based on inadequate appellate briefing are without merit.

*Whether petitioner was denied his right to a fair and impartial jury under the Nevada and United States Constitutions*

Riley claims that he was denied a fair and impartial jury when the trial judge excused, without objection, the potential juror who expressed confusion in the voir dire of the jury venire. This claim was waived when Riley failed to present it on direct appeal. *See* NRS 177.375 (repealed Jan. 1, 1994). Nevertheless, we have already concluded that there was nothing objectionable about the dismissal of the confused potential juror; as a result, Riley was not denied his constitutional right to a fair and impartial jury.

## CONCLUSION

Riley was not denied the reasonably effective assistance of counsel or a fair and impartial jury guaranteed by the Nevada and United States Constitutions. Neither was he denied "actual assistance of counsel" through an alleged display of bias by this court. Accordingly, we affirm the district court's order denying Riley's petition for post-conviction relief.