TIMOTHY LEE REDMEN, Appellant, v. THE
STATE OF NEVADA

No. 21729

March 13, 1992 828 P.2d 395

*Morgan Harris,* Public Defender, and *Mark S. Blaskey* and *Stephen J. Dahl,* Deputy Public Defenders, Clark County, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, and *Daniel M. Seaton,* Deputy District Attorney, for Respondent.

## OPINION

By the Court, MOWBRAY, C. J.:

On February 8, 1990, while traveling to San Diego, appellant and his girlfriend, Melissa Rial, entered Las Vegas. That night, while waiting at a stoplight, they met Max Biederman. The three of them arranged to meet for dinner at a place called Tramps. Appellant and Ms. Rial met Mr. Biederman for dinner and, afterwards, they all went to the Rio Hotel. Later that evening, Ms. Rial and appellant left Mr. Biederman to find a hotel and get some sleep.

The next day, while Ms. Rial remained at the hotel, appellant took Ms. Rial's car and met Mr. Biederman at Tramps. Mr. Biederman offered to introduce appellant to a friend who might offer him a job. Appellant and Mr. Biederman went to the King 8 Motel where the friend was staying. The friend never showed up, so appellant and Mr. Biederman left for the Rio Hotel to see a show.

At the Rio, while Mr. Biederman was inside the hotel, appellant went back to the van to get Mr. Biederman's gun. Appellant testified that, "I think somewhere in the back of my mind I was planning to do what I did." Appellant stated that he thought the scenario about the job was a scam.

Appellant and Mr. Biederman returned back to the King 8 Motel. Appellant struck Biederman one to four times with the revolver and then shot him in the jaw. Appellant then moved Ms. Rial's car to a truck stop. Appellant returned to the motel, because his fingerprints were all over Biederman's van. When he returned, Mr. Biederman was on the sidewalk about to knock on

someone's door. Appellant told him to get behind the van and Biederman complied. Appellant then shot Mr. Biederman two more times.

Appellant took Mr. Biederman's van and returned to his motel with blood on his clothes. He told Ms. Rial that he and Mr. Biederman had gotten into a fight. Ms. Rial helped him clean up, and the two got in the van and returned to pick up Ms. Rial's car. Appellant told Ms. Rial to wait in the car. Appellant walked back to the King 8 Motel. Appellant mutilated Mr. Biederman's face with a wrought iron railing. Appellant also cut Mr. Biederman's hands off and wrapped them in a brown paper bag.

Appellant drove back to his motel in the van. Ms. Rial followed him in her car. She left the car there, and got into the van. Appellant and Ms. Rial drove out to the desert to dump the hands and clothing. The two returned to the motel, got Ms. Rial's car, and left for Idaho.

Mr. Biederman's body was discovered on February 10, 1990, behind a "Dipsy Dumpster" at the King 8 Motel. Las Vegas Metropolitan Police Officer Joe Schmitt and identification specialist Nancy Kingsbury responded to the scene. Pictures were taken, and the victim's wallet was retrieved from his pants.[1]

On February 11, 1990, appellant was apprehended by Corporal Ron Pumphrey of the Idaho State Police Department.[2] On February 13, 1990, Detective Tom Dillard of the Las Vegas Metropolitan Police Department met with appellant in the Bannock County jail in Pocatello, Idaho. Detective Dillard took a statement from appellant. Appellant was then transferred to Clark County, Nevada, where he stood trial for robbery with the use of a deadly weapon and murder in the first degree with the use of a deadly weapon. At the conclusion of the guilt phase, the jury returned a verdict of guilty on both counts.

The jury was unable to reach a determination during the penalty phase. Pursuant to NRS 175.556, a three-judge panel was convened to determine the sentence. The three-judge panel found four aggravating circumstances and one mitigating circumstance.[3]

---

[1]The body was found wrapped in a blanket under a piece of carpet. Found on the ground was a live .22 caliber cartridge. Three metal fragments were recovered from inside the body.

[2]Appellant had been traveling in excess of 100 miles per hour. The police determined that the driving status of appellant had been revoked, and that the vehicle was registered to Max Biederman. A search of appellant's vehicle revealed two pairs of handcuffs, a stun gun with dried blood on it, a survival sheath knife, and a .22 caliber Ruger revolver with the cylinder pin missing. A search of appellant revealed a money clip with $588 and four fired .22 caliber shells.

[3]The three-judge panel found the following aggravating circumstances beyond a reasonable doubt:
1. The murder was committed by a person who was previously convicted

In weighing the mitigating circumstance against the aggravating circumstances, the panel found that the mitigating circumstances did not outweigh the aggravating circumstances. It was the unanimous judgment of the court that appellant be sentenced to death.

Appellant raises several issues by way of appeal. Appellant's first contention is that he was denied his right to a speedy trial.

NRS 178.556 states in part: "If a defendant whose trial has not been postponed upon his application is not brought to trial within 60 days after the finding of the indictment or filing of the information, the court may dismiss the indictment or information." Dismissal is mandatory only absent good cause for the delay. Huebner v. State, 103 Nev. 29, 731 P.2d 1330 (1987); Anderson v. State, 86 Nev. 829, 477 P.2d 595 (1970).

In the present case, appellant invoked his right to a speedy trial, and the trial was set for May 14, 1990. On May 2, 1990, the prosecutor requested that the district court reset the trial date, since he was scheduled to try another death penalty case beginning May 7th. Defense counsel formally opposed the motion, but informed the court that they could not be prepared to go to trial on May 14th.

The trial court found good cause to continue and reset the trial date for June 18, 1990. We conclude that the court was correct in finding good cause. Neither the prosecution nor the defense was prepared to go to trial. Appellant cannot force the court to begin a trial when neither party is prepared to litigate.

Appellant next contends that the court erred in admitting photographs of the victim's mutilated body at the penalty phase of the trial. During the sentencing phase of the trial, the court admitted five photographs of the victim's mutilated body for the purpose of establishing the aggravating circumstance of mutilation. Defense counsel objected to the admission of the photographs on the grounds that they were more prejudicial than probative.

Admissibility of photographs lies within the sound discretion of the district court and, absent an abuse of that discretion, the

of a felony involving the use of violence to another, to-wit: felonious jailbreaking and assault during the commission of a felony;

2. The murder was committed by a person under sentence of imprisonment for breaking and entering and for assault during the commission of a felony;

3. The murder was committed while the person was engaged in the commission of a robbery with use of a deadly weapon; and

4. The murder involved the torture and mutilation of the victim.

The three-judge panel also found the following mitigating circumstance: The defendant was severely abused at an early age.

decision will not be overturned. Ybarra v. State, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984), *cert. denied,* 470 U.S. 1009 (1984); Turpen v. State, 94 Nev. 576, 577, 583 P.2d 1083, 1084 (1978), *cert. denied,* 439 U.S. 968 (1978). Having examined the photographs, we conclude that they were admissible to prove the aggravating circumstances of mutilation. *See* Robins v. State, 106 Nev. 611, 798 P.2d 558 (1990), *cert. denied,* 111 S.Ct. 1608 (1991). We further conclude that the prejudicial effect of the photographs did not substantially outweigh their probative value. *See* NRS 48.035. Accordingly, we conclude that the trial court properly exercised its discretion.

Appellant alleges that it was error to instruct the jury regarding the felony murder rule.[4] Appellant alleges that a conviction of felony murder cannot stand since the indictment failed to allege that the killing was perpetrated in the commission of a felony. We have previously held that "the indictment in a felony murder case need not allege that the killing was perpetrated in the commission of a felony." Theriault v. State, 92 Nev. 185, 191, 547 P.2d 668, 672 (1976) (citing Rogers v. State, 83 Nev. 376, 432 P.2d 331 (1967)).

Appellant also alleges that the court erred in instructing the jury that murder committed in the perpetration of a felony carries a conclusive presumption of malice aforethought.[5] Appellant relies on Carella v. California, 491 U.S. 263 (1989) (due process requires prosecution to prove every element of offense beyond a reasonable doubt), *reh'g denied,* 492 U.S. 937 (1989).

The present instruction does not violate *Carella.* In *Carella,* two instructions were given mandating conclusive presumptions as to fraud and embezzlement based upon failure to return a rental vehicle within an arbitrary time limit.[6] *Id.* at 264. The instruc-

---

[4]Jury Instruction No. 11 stated the following: "Murder of the First Degree is murder which is (a) perpetrated by any kind of willful, deliberate and premeditated killing, or (b) committed in the perpetration or attempted perpetration of a robbery."

[5]Jury Instruction No. 13 stated the following:

There is a kind of murder which carries with it conclusive evidence of premeditation and malice aforethought. This class of murder is murder committed in the perpetration or attempted perpetration of robbery. Therefore, a killing which is committed in the perpetration of the felony of robbery is deemed to be murder in the first degree, whether the killing was intentional, unintentional or accidental. This is called the felony murder rule.

[6]The two instructions appear below:

(1) Presumption Respecting Theft by Fraud:
Intent to commit theft by fraud is presumed if one who has leased or

tions foreclosed independent jury consideration of whether the facts established all the elements of the offenses. *Id.* This is to be distinguished from an instruction which informs a jury as to the findings of fact required to establish a particular element—in this case malice. *See Carella,* 491 U.S. at 266 (when a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt).

Appellant next contends that the trial court erred by allowing the State to call three witnesses during the penalty phase who were not endorsed as witnesses on the information. Appellant contends that he was prejudiced by this error.

NRS 173.045(2) requires the district attorney to endorse such witnesses as are known to him at the time of the filing of the information.[7] Absent evidence to the contrary, an unendorsed witness is presumed to have been unknown to the district attorney. Dalby v. State, 81 Nev. 517, 519, 406 P.2d 916, 917 (1965).

In the present case, three unendorsed witnesses were called at the penalty hearing. One of these witnesses, Dr. Clay Griffith, was called to rebut the testimony of Dr. Masters, a psychiatrist testifying for the defense. The State was only made aware of the defense's intention to present Dr. Masters on the day before the penalty hearing began. Therefore, pursuant to NRS 173.045(2), the State was not required to endorse Dr. Griffith on the information.

---

rented the personal property of another pursuant to a written contract fails to return the personal property to its owner within 20 days after the owner has made written demand by certified or registered mail following the expiration of the lease or rental agreement for return of the property so leased or rented.

(2) Presumption Respecting Embezzlement of a Leased or Rented Vehicle:

Whenever any person who has leased or rented a vehicle wilfully and intentionally fails to return the vehicle to its owner within five days after the lease or rental agreement has expired, that person shall be presumed to have embezzled the vehicle.

*Carella,* 491 U.S. at 264.

[7]NRS 173.045(2) states:

The district attorney or the attorney general shall endorse thereon the names of such witnesses as are known to him at the time of filing the information, and shall also endorse upon the information the names of such other witnesses as may become known to him before the trial at such time as the court may, by rule or otherwise, prescribe; but this does not preclude the calling of witnesses whose names, or the materiality of whose testimony, are first learned by the district attorney or the attorney general upon the trial. He shall include with each name the address of the witness if known to him. He shall not endorse the name of any witness whom he does not reasonably expect to call.

Paul Clark and Kelly Neff were also called as unendorsed witnesses during the penalty hearing. Paul Clark was a correctional officer who testified regarding a fight he had with appellant while appellant was serving a sentence of imprisonment. Kelly Neff testified regarding a fight which appellant had with a Mr. Coiner in which appellant pulled a gun.[8] Neither witness was known to the State prior to trial.

Appellant contends that he was prejudiced by the State's failure to use due diligence in discovering Paul Clark and Kelly Neff before trial. We agree that due diligence is a requirement of NRS 173.045(2). We do not agree, however, that the record establishes a lack of due diligence in the present case. We also cannot agree that appellant suffered prejudice; the three week continuance granted by the trial court cured any prejudice that would have accrued.

Appellant next contends that the trial court improperly allowed testimony from Dr. Griffith, a psychiatrist retained by the prosecution, regarding the future dangerousness of appellant.[9] We agree with appellant. In our view, psychiatric evidence purporting to predict the future dangerousness of a defendant is highly unreliable and, therefore, inadmissible at death penalty sentencing hearings. Thus, the trial court erred in allowing Dr. Griffith's testimony. But because the record contains plentiful other evidence from which the three-judge panel could reasonably infer appellant's future dangerousness, we conclude that this error was harmless beyond a reasonable doubt. *See* Manning v. Warden, 99 Nev. 82, 659 P.2d 847 (1983) (citing Chapman v. California, 386 U.S. 18 (1967)).

We also take this opportunity to re-examine our previous decisions concerning whether a prosecutor may argue the future dangerousness of a defendant and the need to impose the death penalty to protect against future violence. In Riley v. State, 107 Nev. 205, 808 P.2d 551 (1991), we held that " '[w]hen there is evidence . . . of a defendant's past conduct which supports a reasonable inference that even incarceration will not deter the

---

[8]During the course of this fight, appellant placed a gun between Ms. Neff's eyes and stated, "I ought to blow your brains out slut."

[9]Dr. Masters, a psychiatrist for the defense, testified that appellant had "a basic sense of decency" and the potential to "do good for society." In response to this conclusion, Dr. Griffith gave his own opinion that appellant was dangerous and would be a danger in any society that he is in.

defendant from endangering others' lives, a prosecutor is entitled to ask the jury to draw that inference.' " *Id.* at 209, 808 P.2d at 560 (quoting Haberstroh v. State, 105 Nev. 739, 741, 782 P.2d 1343, 1344 (1989)). Today, we expand our holding in *Riley* to allow prosecutors to argue the future dangerousness of a defendant even when there is no evidence of violence independent of the murder in question. In doing so, we align our jurisdiction with the majority of other jurisdictions which have considered this issue. Unlike psychiatric testimony, which jurors often readily accept as reliable expert medical evidence, the predictions of a prosecutor are understood by a jury to be nothing more than the argument of counsel.

Appellant next challenges the constitutionality of NRS 175.556 which authorizes the use of a three-judge panel during the sentencing phase of a capital case in cases where the jury is unable to reach a unanimous verdict upon the sentence.[10] Appellant contends that Nevada's default sentencing scheme violates the equal protection and due process clauses of the United States Constitution.

The United States Supreme Court has previously held that there is no constitutional imperative that a jury have the responsibility of deciding whether the death penalty should be imposed. Spaziano v. Florida, 468 U.S. 447 (1984) (holding that neither the Sixth Amendment nor the due process clause of the Fourteenth Amendment creates a constitutional right to sentencing by a jury in a capital case). In *Spaziano,* a Florida judge disregarded a jury's recommendation of life and imposed a sentence of death. The Supreme Court found that Florida's procedure of allowing a trial court to override a jury recommendation was proper as it was neither arbitrary nor capricious. *Id.* at 466.

Appellant contends that the sentencing scheme provided by NRS 175.556 is arbitrary and capricious. *See* Godfrey v. Georgia, 446 U.S. 420, 427 (1980) (capital sentencing scheme must

---

[10]NRS 175.556 provides as follows:

Procedure when jury unable to reach unanimous verdict. If a jury is unable to reach a unanimous verdict upon the sentence to be imposed, the supreme court shall appoint two district judges from judicial district other than the district in which the plea is made, who shall with the district judge who conducted the trial, or his successor in office, conduct the required penalty hearing to determine the presence of aggravating and mitigating circumstances, and give sentence accordingly. A sentence of death may be given only by unanimous vote of the three judges, but any other sentence may be given by the vote of a majority.

provide meaningful basis for distinguishing cases where the death penalty is imposed from cases where it is not). Appellant's contention is based primarily on his assertion, unsupported by any evidence in the record, that a three-judge panel invariably returns a sentence of death.

This court has previously addressed this exact issue. In Baal v. State, 106 Nev. 69, 787 P.2d 391 (1990), the appellant claimed that sentencing by a three-judge panel resulted in arbitrary and capricious imposition of death sentences. Id. at 74, 787 P.2d at 395. In support of that contention, appellant Baal argued that three-judge panels invariably return a sentence of death. This court noted that appellant Baal cited no empirical evidence for his argument and concluded that the use of a three-judge panel could withstand constitutional scrutiny. Id.; see also Hill v. State, 102 Nev. 377, 724 P.2d 734 (1986), cert. denied, 479 U.S. 1101 (1987).

Appellant also contends that application of NRS 175.556 denied him equal protection under the law. Appellant contrasts NRS 175.556 with NRS 200.366. NRS 200.366(3) states: "The trier of fact in a trial for sexual assault shall determine whether substantial bodily harm has been inflicted on the victim and if so, the sentence to be imposed upon the perpetrator." NRS 200.366 does not provide for a three-judge panel to determine the sentence in the event of a hung jury.

Distinctions between classes are constitutionally improper if the basic distinction between the classes is insupportable. Goldstein v. Pavlikowski, 87 Nev. 512, 516, 489 P.2d 1159, 1162 (1971).[11] Appellant argues that there is no supportable distinction between a capital homicide case and a case of sexual assault. We conclude otherwise.

A capital homicide is a unique kind of case. The gravity of a capital case may render a jury unable to reach a unanimous determination as to sentence. Because juries may frequently be unable to agree upon a sentence, a default sentencing scheme is required.

---

[11]In Goldstein, appellant wanted to have his capital murder trial judged by the trial judge rather than a jury. Capital murders require a jury, so appellant Goldstein's request was denied by the district court. Goldstein appealed, stating that it was an impermissible class distinction to have different procedures at capital murder trials than at non-capital trials. Goldstein, 87 Nev. at 516, 489 P.2d at 1162.

On appeal, we determined that appellant Goldstein was not denied equal protection. Id. at 516, 489 P.2d at 1162. We concluded that the distinction between capital and non-capital offenses was supportable because of the heavy burden borne by the judge in a capital case. Id.

The same problems do not arise in the case of a sexual assault. The jury must choose between two possible penalties, neither one of which is morally troublesome. *See* NRS 200.366.[12] A unanimous determination as to sentence will therefore be possible in most cases. We therefore conclude that a three-judge panel default sentencing scheme is necessary only in the case of a capital homicide.

In accordance with NRS 177.055, we have considered the remaining errors alleged by appellant. We conclude that appellant's contentions are meritless. Also pursuant to NRS 177.055, we have examined the record and determined that the evidence supports the findings of aggravating circumstances, that appellant's sentence was not imposed under the influence of passion, prejudice or any arbitrary factor and that appellant's sentence of death is not excessive, considering both the crime and the appellant. We therefore affirm appellant's conviction and sentence of death.

STEFFEN, J., and Breen, D. J.,[13] concur.

ROSE, J., concurring:

Although I wholeheartedly concur with the majority's opinion, I want to elaborate on why psychiatric predictions of a defendant's future dangerousness are unreliable, and thus should be inadmissible as trial evidence. The testimony of the State's psychiatrist in this case is illustrative of the problem presented by such testimony.

At trial, the court permitted the testimony of Dr. Clay Griffith, a Texas physician specializing in forensic psychiatry.[1] Dr. Griffith testified to his impressive medical credentials in court. He also stated that over the past twenty-five years, he has examined over 8,000 people charged with offenses and has testified in approxi-

---

[12]Under NRS 200.366(2)(a)(1)-(2), the jury may sentence a defendant convicted of sexual assault with substantial bodily harm, as follows:

(1) By imprisonment in the state prison for life, without possibility of parole; or

(2) By imprisonment in the state prison for life with possibility of parole, eligibility for which begins when a minimum of 10 years has been served.

[13]The Honorable Peter I. Breen, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CHARLES E. SPRINGER, Justice. Nev. Const. art. 6, § 4.

[1]Griffith's testimony was undoubtedly influenced by his Texas practice. Death penalty sentencing in Texas is a two-step process. Eligibility for the death penalty is determined by the jurors during the guilt-innocence phase of a capital murder trial. Note, *A Reasoned Moral Response: Rethinking Texas's Capital Sentencing Statute After Penry v. Lynaugh*, 69 Tex.L.Rev. 407, 436 (1990). If a unanimous jury responds affirmatively to three questions, the

mately half of those cases. Of the over one hundred and fifty death penalty-eligible defendants Dr. Griffith has examined, he has testified ninety-seven times for the prosecution and two times for the defense. Based upon his experience, Dr. Griffith informed the jury that he is "one hundred percent accurate" on death penalty cases.[2]

Dr. Griffith did not examine Timothy Redmen in person. Rather, he based his opinion on tapes of Redmen's confession, Redmen's testimony at trial,[3] and approximately one hundred photographs not admitted into evidence.[4] Based upon this evidence, Dr. Griffith concluded that Redmen is a sociopath within the upper limits of this personality disorder, and that he has no feelings and no conscience. He also stated that sociopaths are

---

trial judge has no discretion in sentencing the defendant to death. *Id.* at 438. The second of these questions is:

> (2) whether there is a *probability* that the defendant would commit *criminal acts of violence* that would constitute a *continuing threat to society* . . . .

Tex. Crim. Proc. Code Ann. § 37.071(b) (Vernon Supp. 1991) (emphasis added).

Because Texas cannot obtain a death penalty conviction without convincing jurors that the element of probable future dangerousness has been satisfied, and industry has developed supporting psychiatrists who specialize at this task. Dr. James Grigson, also of Texas, claims to have examined more than 12,000 prisoners during his career and earns approximately $200,000 a year from court-ordered examinations. *See 20/20: Dr. Death* (ABC television broadcast, November 25, 1988) (transcript on file at Journal Graphics) (hereinafter Dr. Death).

[2]Griffith was less certain as to whether he is always accurate in non-death penalty cases.

[3]On cross-examination, Dr. Griffith stated that his opinions were formed when he "watched [Redmen] testify, the manner in which he testified, and the manner in which he answered questions, he was very controlled." In particular, he stated that his conclusion that Redmen had neither a conscience nor feelings derived from Redmen's failure to use the word "anger" or the term "excitement" when he testified. Dr. Griffith subsequently admitted that nothing Redmen said or did on the stand could have swayed his opinion of him, given all the material he had.

[4]I also am troubled by the fact that an expert witness offering opinion testimony was given access to photographs considered too prejudicial to be seen by the jury. As Dr. Griffith has denied relying upon Redmen's trial testimony in forming his opinion, and as no psychological examination was conducted by him, it appears that Dr. Griffith's conclusions were based primarily upon this inadmissible evidence and Redmen's confession. Furthermore, Dr. Griffith told the three-judge panel that his opinion was based in part upon these one hundred photographs that they were not allowed to see. If this had been a jury, its logical conclusion would have been that Dr. Griffith possessed not only superior scientific knowledge but also better factual knowledge of the case than was presented to the jury.

untreatable and are in continuous conflict with society, and that Redmen will continue to be a danger to society.

The seminal case addressing expert testimony by psychiatrists in death penalty cases is Barefoot v. Estelle, 463 U.S. 880 (1983). *Barefoot* was a Texas case involving the murder of a police officer by a man with prior possession offenses but no history of violent crimes. *Id.* at 883-84, 917. The trial court heard testimony from two psychiatrists, neither of whom had examined or requested to examine the defendant. Both recited their impressive credentials to the jury. *Id.* at 917 (Blackmun, J., dissenting). In addition, as in the instant case, one of the psychiatrists, Dr. James Grigson, stated that Barefoot ranked "above 10" on a scale of one to ten for sociopaths. *Id.* at 919. The defense in *Barefoot* argued that admission of the psychiatrists' testimonies was unconstitutional because psychiatrists are not competent to predict the future and because their error rate is extremely high. *Id.* at 884-85. The majority concluded that the effect of such testimony could be adequately assuaged through impeachment of the witness and through the introduction of opposing witnesses.[5] *Id.* at 899-901.

I find the dissent of Justice Blackmun instructive. He argues that psychiatric predictions of future dangerousness are unreliable, that it is extremely difficult to attack the credibility of a psychiatrist's opinion on this subject, and that the need for reliable evidence in a death penalty case mandates the exclusion of expert evidence of questionable reliability. Concerning the accuracy of psychiatric predictions, he states:

> The American Psychiatric Association (APA), participating in this case as *amicus curiae,* informs us that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." Brief for American Psychiatric Association as *Amicus Curiae* 12 (APA Brief). The APA's best estimate is that *two out of three* predictions of long-term future violence made by psychiatrists are wrong. *Id.,* at 9, 13. The Court does not dispute this proposition, see *ante,* at 899-901, n. 7, and indeed it could not do so; the evidence is overwhelming. For example, the APA's Draft Report of the Task Force on the Role of Psychiatry in the Sentencing Process (1983) (Draft Report) states that "[c]onsiderable evidence has been accumulated by now to demonstrate that long-term predic-

---

[5] The majority in Barefoot v. Estelle, 463 U.S. 880, 901 (1983), went so far as to say that "[n]either the petitioner nor the [American Psychiatric Association] suggests that psychiatrists are *always wrong* with respect to future dangerousness, *only most of the time.*" (Emphasis added.)

tion by psychiatrists of future violence is an extremely inaccurate process." *Id.*, at 29. John Monahan, recognized as "the leading thinker on this issue" even by the State's expert witness at Barefoot's federal habeas corpus hearing, Hearing Tr. 195, conclude that "the 'best' clinical research currently in existence indicates that psychiatrists and psychologists are accurate in no more than one out of three predictions of violent behavior," even among populations of individuals who are mentally ill and have committed violence in the past. J. Monahan, The Clinical Prediction of Violent Behavior 47-49 (1981) (emphasis deleted) (J. Monahan, Clinical Prediction); see also *id.*, at 6-7, 44-50. Another study has found it impossible to identify any subclass of offenders "whose members have a greater-than-even chance of engaging again in an assaultive act." Wenk, Robison, & Smith, Can Violence be Predicted?, 18 Crime & Delinquency 393, 394 (1972). Yet another commentator observes: "In general, mental health professionals . . . are more likely to be wrong than right when they predict legally relevant behavior. When predicting violence, dangerousness, and suicide, they are far more likely to be wrong than right." Morse, Crazy Behavior, Morals, and Science: An Analysis of Mental Health Law, 51 S. Cal. L. Rev. 527, 600 (1978) (Morse, Analysis of Mental Health Law). Neither the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right.

*Id.* at 920-921 (Blackmun, J., dissenting) (emphasis in original; footnote omitted).

Evidence is only admissible if it is relevant. NRS 48.025(2). To be relevant, the evidence must have a tendency to make the existence of a material fact more or less probable than it would be without the evidence. NRS 48.015. If the American Psychiatric Association and other scholarly studies are correct, expert psychiatric testimony concerning an individual's future dangerousness does not make the existence of that dangerousness more or less probable. Thus, such evidence should be disallowed because it is not relevant.

Furthermore, Justice Blackmun notes that the insidious nature of the psychiatrists' mostly inaccurate testimony is compounded by the fact that jurors readily accept as factual opinion testimony by qualified experts in scientific fields.[6] *Id.* at 926. Where highly

---

[6]For example, Blackmun notes that polygraph evidence is generally excluded because of concerns that the jury will be unduly influenced by it,

credentialed scientific experts swear to their one hundred percent accuracy, impeachment provides an ineffectual remedy. *Id.* at 929-30.

The practical effect of permitting psychiatric testimony on a defendant's future dangerousness in the trial of death penalty cases would be more expert testimony and additional costs. If the State is permitted to present such evidence, the defense will want, and indeed should be entitled to, a psychiatrist to testify and rebut the State's expert. Both psychiatrists will be paid by the State. The end result would be that in death penalty cases we would extend the time of trials, have additional expert witnesses giving their speculation on a defendant's future dangerousness, and increase costs, all without any clear benefit to our understanding of the case.

The answer is simple and it is the one we announce today. Prohibit the admission of this unreliable expert testimony and let the juries in Nevada make decisions on the death penalty as they have for years—based upon the facts of the case and the arguments of counsel.

YOUNG, J., concurring in part and dissenting in part:

Appellant challenges the constitutionality of NRS 175.556 which provides for the appointment of a three-judge panel to sentence a defendant convicted of first degree murder when the jury is unable to reach a unanimous verdict. For the reasons I set forth in my dissent in Beets v. State, 107 Nev. 957, 821 P.2d 1044 (1991), I am unable to conclude that the sentencing procedure is constitutional under Godfrey v. Georgia, 446 U.S. 420 (1980).

I therefore dissent from the portion of the majority opinion which concludes that NRS 175.556 is constitutional. I concur with the remainder of the majority opinion.

---

even though the reliability of polygraph tests (eighty to ninety percent accuracy) greatly exceeds that of psychiatric testimony. Barefoot v. Estelle, 463 U.S. 880, 930 (1983) (Blackmun, J., dissenting).