*913
 
 OPINION
 

 Per Curiam:
 

 On June 28, 1995, a jury found William Witter guilty of murder with use of a deadly weapon, attempted sexual assault with use of a deadly weapon, and burglary. A penalty hearing was held on July 10, 1995, through July 13, 1995, after which, by way of special verdict, the jury sentenced Witter to death by lethal injection. The district court entered an amended judgment of conviction on August 2, 1995, based on the jury’s sentence of death for the first-degree murder charge and imposing a twenty-year sentence for attempted murder (plus a twenty-year sentence enhancement for use of a deadly weapon), a twenty-year sentence for attempted sexual assault (plus a twenty-year sentence enhancement for use of a deadly weapon), and a ten-year sentence for burglary. All sentences are to run consecutively. Witter raises numerous issues on appeal. Although we conclude that the State has failed to prove the prevention of lawful arrest statutory aggravator beyond a reasonable doubt, we conclude that the remaining aggravators outweigh the mitigating evidence presented by Witter. Since Witter’s remaining arguments are without merit, we affirm the district court’s judgment of conviction and sentence of death.
 

 FACTS
 

 On November 14, 1993, Kathryn Cox (Kathryn) was working as a retail clerk for the Park Avenue Gift Shop located in the Luxor Hotel in Las Vegas, Nevada. James Cox (James), Kathryn’s husband, drove a taxicab in the Las Vegas area. At about 10:25 p.m., Kathryn called James and informed him that she was having trouble with her car and needed assistance. James told her that he would be over to pick her up in about twenty-five to thirty minutes. Kathryn returned to her car, got in, locked her door, and began to read a book.
 

 About five to ten minutes later, the passenger side door opened, and William Witter got into the car. Witter demanded
 
 *914
 
 that Kathryn drive him out of the lot. When Kathryn informed him that she could not, Witter stabbed her just above her left breast. Witter pulled Kathryn closer to him and told her that he was going to kill her. After stabbing Kathryn several more times, Witter became quiet, unzipped his pants and ordered Kathryn to perform oral sex. Kathryn attempted to comply with his demands, but because she had a punctured lung, she kept passing out. Witter pulled Kathryn into a sitting position and told her, “You’re probably already dead.” Kathryn managed to open her door and attempted to run away, but was only able to get about ten or fifteen feet before Witter caught her. Witter forced Kathryn back into the car and forced her to kiss him. He then used his knife to cut away Kathryn’s pants and began to fondle her vaginal area with his finger.
 

 Kathryn observed her husband’s cab pull up next to the driver’s side of her car. Witter, not knowing that James was Kathryn’s husband, held Kathryn close and stated, “Don’t say anything. I’m going to tell him that you’re having a bad cocaine trip.” James opened the driver’s side door of Kathryn’s car and told Witter to get out. Witter got out of the car, walked over to James, and stabbed him numerous times. James fell backwards and into Kathryn, who had gotten out of the car, knocking her to the ground. Kathryn got up and ran for a bus stop. Once again, Witter caught Kathryn and carried her back to her car. After pulling the rest of Kathryn’s clothes off, Witter attempted to stuff James’ body underneath James’ cab. Kathryn then heard hotel security approaching her vehicle.
 

 A security officer in charge of patrolling the Excalibur Hotel’s employee parking lot approached Kathryn’s car and confronted Witter. After a short standoff, the security officer’s backup arrived, and Witter was subdued. Paramedics arrived a short time later, and Kathryn was taken to the hospital where she eventually recovered from her injuries. James was already dead when the paramedics arrived.
 

 DISCUSSION
 

 Guilt Phase
 

 Jury voir dire
 

 The scope of jury voir dire is within the sound discretion of the trial court and will be given considerable deference by this court. Cunningham v. State, 94 Nev. 128, 575 P.2d 936 (1978). The critical concern of jury voir dire is to discover whether a juror “will consider and decide the facts impartially and conscientiously apply the law as charged by the court.” Adams v. Texas, 448 U.S. 38, 45 (1980).
 

 
 *915
 
 1.
 
 Question regarding impact of prior violent felony conviction
 

 In Witherspoon v. Illinois, 391 U.S. 510 (1968), the United States Supreme Court held that the prosecution could properly ask a potential juror whether the juror would automatically vote against the death penalty regardless of the facts of the case. Likewise, in Morgan v. Illinois, 504 U.S. 719 (1992), the Court held that the defense was entitled to ask a potential juror whether the juror would automatically vote for death regardless of the facts of the case.
 

 At trial, the district court denied Witter’s request to ask potential jurors the following: “If there was evidence that Defendant had a prior felony conviction involving the use or threat of violence, would you still consider all three sentencing alternatives in your deliberations?” The district court found that the question violated EJDCR 7.70.
 
 [1]
 
 Witter contends that the question, merely attempts to death qualify the jury through the use of a
 
 Morgan
 
 type question, and if the question violates EJDCR 7.70, then EJDCR 7.70 violates due process concerns.
 

 Incorporated within Witter’s question is the statutory aggravated listed in NRS 200.033(2) (prior felony conviction involving the use or threat of violence). If Witter were allowed to ask such a question, he would be able to read how a potential juror would vote during the penalty phase of the trial. This goes well beyond determining whether a potential juror would be able to apply the law to the facts of the case. We do not read either the
 
 Morgan
 
 or the
 
 Witherspoon
 
 decisions to allow for one side to gain such an unfair advantage. Moreover, the record shows that other questions asked during voir dire properly death qualified the jury. Since the question touches on an anticipated instruction of law during the penalty phase, and inquires into the verdict a juror would return based on hypothetical facts, we conclude that the district court properly found that the questions violated EJDCR 7.70. We also conclude that the restrictions of EJDCR 7.70 are consistent with the holdings in
 
 Morgan
 
 and
 
 Witherspoon
 
 and that the rule does not offend due process concerns. For these reasons,
 
 *916
 
 we conclude that the district court did not abuse its discretion when it precluded Witter’s counsel from asking his proposed question of prospective jurors.
 

 2.
 
 Newspaper article
 

 On one of the days during jury voir dire, a Las Vegas newspaper published a letter to the editor authored by Deputy Attorney General Victor H. Schulze, II. The article stated, among other things, that criminals should take responsibility for their crimes. The article did not mention, nor did it allude to, Witter’s case. The district court refused to allow Witter to question the jury about the article. Witter now argues that the district court abused its discretion. We disagree.
 

 We have recognized that, in an effort to protect the defendant’s right to a fair trial, procedural safeguards should be employed by the trial judge to insure that potentially prejudicial news accounts of the proceedings do not prejudice the defendant. Crowe v. State, 84 Nev. 358, 441 P.2d 90 (1968). “The trial judge has large discretion in ruling on the issue of possible prejudice resulting from news articles concerning a defendant on trial and each case must turn on its special facts.”
 
 Id.
 
 at 363, 441 P.2d at 93 (citation omitted).
 

 While we recognize that the trial court failed to utilize any procedural protections to insure that the jury was not tainted by Schulze’s article, we also recognize that the article did not specifically refer to Witter’s case. We believe that the district court would have run a greater risk of contamination if it were to have allowed Witter’s counsel to question the jurors about the article. Under the circumstances, we conclude that Witter was not prejudiced by the district court’s refusal to allow his counsel to question the jury about Schulze’s article.
 

 Exclusion of witnesses
 

 At the beginning of trial, Witter made a motion to exclude all witnesses pursuant to NRS 50.155(1),
 
 [2]
 
 the witness exclusion rule, including those who would be testifying at a penalty hearing. The district court invoked the rule as to the guilt phase of the trial, but refused to invoke it with regard to the penalty phase.
 
 *917
 
 Witter now argues that the district court abused its discretion. We disagree.
 

 NRS 47.020 states that the rules of evidence under NRS Title 4 are to govern the proceedings of the courts of the State of Nevada, but are not to apply to sentencing proceedings. Witter argues that NRS 47.020 should be disregarded in capital cases because of the severity of the punishment.
 
 See
 
 Griffin v. Illinois, 351 U.S. 12 (1956) (those charged with capital offenses are to be granted special considerations). We conclude that this argument is without merit. Had the legislature intended to exempt death cases from the exclusion of NRS 47.020, we believe it would have expressly provided for such an exemption. Moreover, we conclude that the district court properly found that the witness exclusion rule did not need to be invoked against penalty phase witnesses in this case. “The purpose of sequestration of witnesses is to prevent particular witnesses from shaping their testimony, and to detect falsehood by exposing inconsistencies.” Givens v. State, 99 Nev. 50, 55, 657 P.2d 97, 100 (1983) (citations omitted),
 
 overruled on other grounds,
 
 Talancon v. State, 102 Nev. 294, 721 P.2d 764 (1986). Kathryn Cox was the only witness to testify at both the guilt phase and the penalty phase, and her presence at both proceedings is specifically provided for in NRS 50.155(2)(d). For these reasons, we conclude that the district court did not err when it refused to invoke the witness exclusion rule against penalty-phase witnesses.
 

 Jury instructions
 

 With regard to his first-degree murder conviction, Witter argues that the instructions given to the jury failed to distinguish adequately the elements of malice and premeditation, and that the district court erred when it refused his proposed jury instruction which attempted to define deliberation.
 
 [3]
 

 
 *918
 
 We have previously held that the premeditation instruction challenged here provides the jury with an accurate definition of premeditation and deliberation. See Powell v. State, 108 Nev. 700, 708, 838 P.2d 921, 926 (1992), vacated on other grounds, 511 U.S. 79 (1994). We conclude that this court's reasoning in Powell remains sound. Furthermore, in Guy v. State, 108 Nev. 770, 839 P.2d 578 (1992), cert. denied, 507 U.S. 1009 (1993), this court held that the very same malice jury instruction accurately informed the jury of the distinction between express malice and implied malice. See NRS 200.020. We conclude that the jury instructions actually submitted to the jury were proper, and that the district court did not err when it refused Witter's instruction defining deliberation.
 

 Supreme Court Rule 250
 

 Part III, section B of SCR 250 states, in relevant part:
 

 After close of the evidence, the court shall confer with the prosecuting attorney and defense counsel. The conference shall be reported.
 

 The following matters shall be concluded during the conference after close of the evidence:
 

 1. Proposed written instructions shall be presented to the court for rulings. The defendant need not be present when the instructions are settled.
 

 2. The court shall make a final ruling on any issue properly raised as to which a tentative ruling or no ruling was made during presentation of the evidence.
 

 Toward the end of both the guilt and penalty phases of the trial, counsel for both the prosecution and defense met with the district court judge in chambers to discuss jury instructions. After each meeting, when the proceedings were back on the record, the court asked Witter's counsel jibe had any objections. Wjtter's counsel objected to the procedure used by the court, arguing that under SCR 250 the entire discussion should have been on the record. The court found the procedure to be proper. Witter now argues that he was deprived of a fair trial.
 

 We conclude that the procedures followed by the district court were sufficient to guarantee that any legitimate objections Witter may have had about the jury instructions were considered by the
 
 *919
 
 district court and were preserved in the record. Accordingly, we conclude that the procedures used by the district court satisfy the provisions of SCR 250.
 

 Penalty phase
 

 Motion for continuance
 

 On June 28, 1995, the jury returned a verdict of guilty on all counts, and the district court scheduled the penalty hearing to begin on July 10, 1995, with discovery to occur on July 6, 1995. In the course of the penalty hearing, the State introduced evidence of Witter’s gang affiliation, and evidence that a shank (knife) was found in his jail cell while he was awaiting trial. At the penalty hearing, Witter made a motion for continuance, arguing that he planned to have an expert testify about gang violence and that he needed more time to secure such an expert. The district court concluded that Witter had adequate time to prepare for the penalty hearing and, accordingly, denied Witter’s motion. Witter now argues that the district court abused its discretion for the following reasons: (1) a shank was found in Witter’s jail cell on August 5, 1994, yet the State did not inform him of its intention to use the evidence at the penalty hearing until July 5, 1995; (2) he only had four days from the date of discovery until the date of the penalty hearing in which to secure expert testimony regarding gang violence; and (3) the district court unfairly denied his motion to continue the penalty phase because he was unable to secure expert witness testimony during the guilt phase.
 

 The granting of a motion to continue is within the sound discretion of the trial court. Doleman v. State, 107 Nev. 409, 812 P.2d 1287 (1991). In Rogers v. State, 101 Nev. 457, 705 P.2d 664 (1985),
 
 cert. denied,
 
 476 U.S. 1130 (1986), we held that one week’s notice of the prosecution’s intent to present evidence of prior convictions involving violence was sufficient. In that case, we concluded that the defendant was not prejudiced because he had actual knowledge of the aggravating circumstance and had sufficient time to prepare a challenge.
 
 See also
 
 Browning v. State, 104 Nev. 269, 757 P.2d 351 (1988) (six-day notice of the State’s intent to use an aggravating circumstance found to be sufficient).
 

 In the present case, on June 20, 1995, almost a full year before the penalty hearing, the State notified Witter’s counsel that it was investigating an alleged discipline problem (possession of a shank) involving Witter. In addition, Witter’s body displays a number of tatoos that are consistent with those worn by members of street gangs in San Jose, California, Witter’s hometown. From
 
 *920
 
 these facts, we conclude that Witter’s counsel had, or should have had, actual notice of Witter’s possession of a shank while incarcerated, and his involvement with street gangs. We also conclude that even if Witter were able to secure expert testimony regarding gang violence in prisons, such testimony would have done little to mitigate his involvement. We therefore conclude that Witter was not prejudiced by the district court’s decision to allow only four days between discovery and the penalty hearing. Accordingly, we conclude that the district court did not abuse its discretion when it refused to grant Witter’s motion for continuance.
 

 Penalty phase evidence
 

 Witter argues that the district court erred in admitting evidence of his possession of a shank, since his possession was an unadju-dicated offense and he was not allowed representation at the disciplinary hearing which he contends was a violation of the Sixth Amendment to the United States Constitution.
 

 ■ Under NRS 175.552,
 
 [4]
 
 the trial court is given broad discretion on questions concerning the admissibility of evidence at a penalty hearing.
 
 Guy,
 
 108 Nev. 770, 839 P.2d 578. In Robins v. State, 106 Nev. 611, 798 P.2d 558 (1990),
 
 cert. denied,
 
 499 U.S. 970 (1991), this court held that evidence of uncharged crimes is admissible at a penalty hearing once any aggravating circumstance has been proven beyond a reasonable doubt.
 

 In this case, the State proved beyond a reasonable doubt that Witter had a previous felony conviction involving violence to the person of another, that Witter murdered James in the commission of or an attempt to commit a burglary, and that Witter murdered James while engaged in the commission of or attempt to commit a sexual assault. We therefore conclude that the district court properly admitted evidence of his possession of a shank while he was incarcerated.
 

 Furthermore, we conclude that Witter did not have a Sixth Amendment right to counsel at his disciplinary hearing. While a
 
 *921
 
 prisoner may have a Sixth Amendment right to counsel at a disciplinary hearing when the charge involves conduct that is punishable under state law,
 
 see
 
 Wolff v. McDonnell, 418 U.S. 539 (1974); Gagnon v. Scarpelli, 411 U.S. 778 (1973), Witter’s possession of the shank is not a punishable offense under the laws of Nevada.
 

 Witter also contends that the district court erred in admitting evidence showing that he is a member of a street gang. According to Witter, the evidence lacked any probative value and was offered only to inflame the passions of the jury.
 

 NRS 48.035(1) states that “[ajlthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues or of misleading the jury.” While this court has cautioned that the introduction of gang membership during a penalty hearing may be unfairly prejudicial,
 
 see
 
 Young v. State, 103 Nev. 233, 737 P.2d 512 (1987); Lay v. State, 110 Nev. 1189, 886 P.2d 448 (1994);
 
 see also
 
 Dawson v. Delaware, 503 U.S. 159 (1992), this court has held that “[fjrom
 
 Dawson,
 
 we derive the following rule: Evidence of a constitutionally protected activity is admissible only if it is used for something more than general character evidence.” Flanagan v. State, 109 Nev. 50, 53, 846 P.2d 1053, 1056 (1993). In
 
 Dawson,
 
 the United States Supreme Court reasoned that “[a] defendant’s membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury’s inquiry into whether the defendant will be dangerous in the future.” 503 U.S. at 166.
 

 In this case, the State presented testimony from the arresting officers indicating that Witter told them that he could heighten his reputation if he were to kill police officers, and from a second officer who stated that from the clothing Witter was wearing and from the tatoos on his arm, he believed that Witter was a member of a violent California gang known as the “Norteños.” We conclude that this evidence tends to show that Witter posed a threat of future violence to the community. Moreover, we conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, or confusion of the issues or of misleading the jury. Accordingly, we conclude that the district court properly admitted evidence of Witter’s affiliation with a street gang.
 

 Motion for mistrial
 

 At the penalty hearing, Kathryn Cox read a prepared statement to the jury in which she demanded that the jury show no mercy to
 
 *922
 
 the defendant, and in which she informed the jury that she intended to do everything in her power to see that Witter received no mercy. Witter made a motion for mistrial, arguing that Kathryn’s statements went beyond the scope of what is acceptable as a victim-impact statement since the statements unduly inflamed the passions of the jury and that they amounted to a plea for the return of a death penalty sentence. The district court denied Witter’s motion. Witter now argues that he was deprived of a fair trial and that the district court abused its discretion when it denied his motion for mistrial.
 

 In Payne v. Tennessee, 501 U.S. 808, 827 (1991), the Supreme Court overruled prior precedent and held that if a State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no
 
 per se
 
 bar. In Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992), we applauded the decision reached in
 
 Payne
 
 and concluded that the decision comports with the principles of the Nevada Constitution. NRS 175.552(3) states, in part, that “[i]n the [penalty] hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible.” However, while a victim may address the impact that the crime has had on the victim and the victim’s family, a victim can only express an opinion regarding the defendant’s sentence in non capital cases. Randell v. State, 109 Nev. 5, 846 P.2d 278 (1993).
 

 We conclude that in asking the jury to “show no mercy,” Kathryn was not expressing her opinion as to what sentence Witter should receive. Rather, we believe that Kathryn was only asking that the jury return the most severe verdict that it deemed appropriate under the facts and circumstances of this case. Kathryn’s statements also emphasize the devastating effect this crime has had on her and her family’s life. Such sentiments are admissible victim-impact statements. NRS 175.552(3). We therefore conclude that Witter was not deprived of a fair trial and that the district court properly denied Witter’s motion for mistrial.
 

 Witter’s motion to argue last
 

 Witter contends that NRS 200.030(4)
 
 [5]
 
 shifts the burden of proof to the defendant to prove that mitigating circumstances
 
 *923
 
 outweigh aggravating circumstances. Witter cites Griffin v. Illinois, 351 U.S. 12 (1956), and argues that the district court should have allowed him to argue last during closing arguments. We disagree.
 

 First, we read NRS 200.030(4) as stating that the death penalty is an available punishment only if the state can prove beyond a reasonable doubt at least one aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating evidence offered by the defendant. The statute does not shift the burden of proof to the defendant. Second, unless the case is submitted to the jury by one or both sides without argument, NRS 175.141
 
 [6]
 
 mandates that the district attorney, or other counsel for the state, open and conclude argument. Under NRS 175.141, the district court does not have the authority to grant Witter’s request. Moreover, such a concession would unfairly disadvantage the prosecution. Accordingly, we conclude that the district court did not err when it denied Witter’s request to argue last during the penalty phase.
 

 Prosecutorial misconduct
 

 The trial court has a duty to ensure that an accused receives a fair trial, and to this end the court must exercise its discretionary power to control obvious prosecutorial misconduct sua sponte. Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985),
 
 cert. denied,
 
 486 U.S. 1036 (1988). In reviewing a prosecutor’s comments, the relevant inquiry is whether the comments were so unfair that they deprived the defendant of due process. Darden v. Wainwright, 477 U.S. 168 (1986). However, comments that are harmless beyond a reasonable doubt do not warrant reversal. Witherow v. State, 104 Nev. 721, 765 P.2d 1153 (1988).
 

 1.
 
 Community standards
 

 During the penalty phase closing argument, the prosecutor commented:
 

 
 *924
 
 When we talk about the death penalty, there are two schools of thought as to why society might have it. One school of thought is that of deterrence. Deterrence is achieved through severity of punishment. It is important for the image of the criminal justice system to have the death penalty. It is important to send a message to people in the community and to would[-]be murderers that there are lines that you do not cross in Nevada; that there is some conduct that simply will not be tolerated and will be met with a very, very severe penalty.
 

 The other school of thought is one of punishment. It is an expression of society’s sense of moral outrage. Society has a right to feel that outrage when confronted with these crimes and to respond to it. It flows from the concept that consequences follow actions; that there are penalties for crimes; that punishment should fit the crime; the worse the act, the worse the penalty.
 

 The prosecutor also commented that anything less than the death penalty would be disrespectful to the dead and irresponsible to the living. Witter argues that these statements amount to an impermissible comment on community standards. We disagree.
 

 In
 
 Collier,
 
 we held that a prosecutor’s statement that if the jury was not angry with the defendant then “we are not a moral community,” improperly inflamed the jury and amounted to pros-ecutorial misconduct. 101 Nev. at 479, 705 P.2d at 1129. Nevertheless, the prosecutor may go beyond the evidence to discuss general theories of penology such as the merits of punishment, deterrence and the death penalty.
 
 Id.
 
 at 478, 705 P.2d at 1129.
 

 We conclude that the comments cited above were an attempt to educate the jury about some of the theories supporting our criminal justice system, and why the death penalty is an available option. Since these are proper areas for prosecutorial comment, we conclude that the prosecutor did not engage in misconduct.
 

 2.
 
 Duty to society at large
 

 During the penalty phase closing argument, the prosecutor commented:
 

 What message does this punishment send today? Will we tell would[-]be murders, will we tell this community, that you can kill a man, thrust a knife into his skull 16 times, one time through his skull, 16 times into his body, that you can perpetrate unspeakable, despicable deeds upon his wife in
 
 *925
 
 her own car and that you, the husband, can drive upon that crime scene and witness your wife bleeding to death, struggling for your life, what message does it send to say the man that perpetrates those crimes can live his life in prison, can write his family, see his family, speak to his family?
 

 Witter argues that these statements amount to an improper plea to a duty to society at large.
 
 See
 
 Haberstroh v. State, 105 Nev. 739, 782 P.2d 1343 (1989) (prosecutor committed misconduct by referring to the jury as “the conscience of the community”);
 
 Collier,
 
 101 Nev. 473, 705 P.2d 1126; Flanagan v. State, 104 Nev. 105, 754 P.2d 836 (1988),
 
 vacated on other grounds sub nom.,
 
 Flanagan v. Nevada, 503 U.S. 931 (1992) (prosecutor’s remark, “[i]f we don’t punish, then society is going to laugh at us” found to be improper). We disagree.
 

 We conclude that these statements properly focus on what would be an appropriate punishment under the facts and circumstances of this case, as well as what would be necessary to deter others from committing such a brutal act. These are entirely proper areas for comment. Accordingly, we conclude that these statements did not constitute an improper plea to a duty to society at large.
 

 3.
 
 Reference to matters outside the record
 

 The following exchange took place during the prosecution’s closing argument during the penalty phase:
 

 MR. OWENS: And it’s very subtle, and you may not have noticed it, but in any penalty hearing what the defense and every witness that the defense calls wants you to do is forget about —
 

 MR. KOHN: I object, Your Honor.
 

 THE COURT: Overruled.
 

 MR. OWENS: What the defense has done in this case, ladies and gentlemen, is to try to make you forget about Kathryn Cox and James Cox. The whole case gets turned upside down and they twist things around until they can portray the vie — the defendant, William Witter, as if he is the victim.
 

 Witter argues that in stating “in any penalty hearing what the defense and every witness that the defense calls wants you [the jury] to do is to forget about [the victims],” the prosecution improperly referred to matters outside the record on appeal.
 
 See
 
 State v. Kassabian, 69 Nev. 146, 243 P.2d 264 (1952). Witter also argues that these statements improperly disparage a legiti
 
 *926
 
 mate defense tactic. See Williams v. State, 103 Nev. 106, 734 P.2d 700 (1987); Pickworth v. State, 95 Nev. 547, 598 P.2d 626 (1979).
 

 We conclude that both of Witter's arguments lack merit. After the objection, the prosecutor modified his statement to conform to the facts of this case. As such, the statement did not refer to matters outside of the record. Moreover, the statement did not disparage a legitimate defense tactic. Rather, the statement merely attempted to keep the jury's focus on the actual victims of Witter's crime. We therefore conclude that the prosecutor's statements were proper.
 

 4. Comments about possible fi4ture crimes
 

 The prosecutor made the following comments during the penalty phase closing argument:
 

 Don't let him go back where he can murder again, and perhaps this time a corrections officer, because that is exactly what he has threatened to do. He told the police officers that "[t]ake these handcuffs off of me so I can kill a police officer. That's all I need to do to raise my reputation higher."
 

 Don't give him the chance. Don't let it happen because it wouldn't be fair; it wouldn't be justice.
 

 But we are going to place William Witter-at least if we do what the defense wants you to do, we are going to place him in prison, where he can heighten his reputation and perpetrate unspeakable crimes on perhaps unsuspecting guards.
 

 And certainly guards are trained individuals; they are trained to protect themselves, but they don't have eyes in the back of their heads, and they don't know when a William Witter will wrap a shank that he made in a towel and become angry and thrust that into the life of a corrections officer and bring about another tragedy.
 

 History repeats itself.
 

 What unsuspecting prisoner might William Witter's life cross and what might happen to that prisoner? Oh, certainly, that's just a prisoner and he's a wrongdoer and maybe he gets what he deserves.
 

 Interestingly enough, the defense didn't ask their witness perhaps the most important question for you people:
 

 
 *927
 
 Doctor, let’s talk about the future dangerousness of this man. Can anybody in your profession predict future dangerousness?
 

 So I took the doctor through a history of violence and asked: Does history repeat itself? Are the acts of the defendant indicators of his future dangerousness?
 

 Because you people need to know what kind of danger rests in the future of lives of other individuals that come in contact with Dr. Etcoff.
 

 Now that’s a question that they didn’t ask. It’s a question I wanted you to know; and the answer was clear: History repeats itself.
 

 Knowing the future dangerousness, it would be disrespectful to the dead and irresponsible to the living to let this man have his life of prison, to let him create another personal jungle for himself like the jungle that he created in the parking lot on November 14, 1993.
 

 In
 
 Collier,
 
 we held that a prosecutor’s remarks which sought to promote a conclusion that a defendant’s rehabilitation was improbable, that he might well kill again while in prison, and that he should therefore be put to death were highly inappropriate. 101 Nev. at 478, 705 P.2d at 1129. In Riley v. State, 107 Nev. 205, 219, 808 P.2d 551, 560 (1991),
 
 cert.
 
 denied, ..... U.S. ....., 115 S. Ct. 1431 (1995), we modified our holding in
 
 Collier
 
 to allow a prosecutor to ask a jury to draw an inference of future dangerousness when there is evidence of a defendant’s past conduct that would support a reasonable inference that even incarceration would not deter the defendant from endangering others’ lives. Finally, in Redmen v. State, 108 Nev. 227, 828 P.2d 395 (1992),
 
 cert. denied,
 
 506 U.S. 880 (1992),
 
 overruled on other grounds,
 
 Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995), we expanded our holding in
 
 Riley
 
 to allow prosecutors to argue the future dangerousness of a defendant even when there is no evidence of violence independent of the murder in question.
 

 Witter contends that the prosecutor’s statements were improper under
 
 Collier.
 
 We disagree. In accordance with our holding in
 
 Redmen,
 
 the prosecutor was allowed to argue that Witter posed a threat of future dangerousness based solely on his murder of James. Moreover, in
 
 Haberstroh,
 
 105 Nev. 739, 782 P.2d 1343, we held that a defendant’s past conduct in jail justifies a prosecutor’s comment that defendant could pose a continuing threat to others. In this case, the record clearly shows that a shank was found in Witter’s cell while he was awaiting trial. We therefore
 
 *928
 
 conclude that the prosecutor's statements emphasized the potential future threat Witter posed to society. As such, we conclude that those statements were proper.
 

 5. "Golden Rule"plea
 

 During the penalty phase closing argument, the prosecutor commented:
 

 Do I make these statements to excite you or to remind you of the violence that encompasses the defendant? For a moment, we recreate that crime because this punishment has to fit that crime.
 

 But how aggravating is it to sit there and this man get in your car, the vehicle that you own, and begin to perpetrate these crimes on you?
 

 It is improper for a prosecutor to make a plea to return a death penalty verdict on behalf of victims. Howard v. State, 106 Nev. 713, 800 P.2d 175 (1990). It is equally unacceptable for a prosecutor to ask the jury to stand in the shoes of the victim (the Golden Rule argument). Id.; McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984). Witter argues that the language cited above, along with the prosecutor's comment that anything less than the death penalty would be disrespectful to the dead and irresponsible to the living, amounts to an improper "Golden Rule" plea as well as a plea to the jury to return a death penalty verdict on behalf of the victim in this case. We disagree.
 

 In commenting that anything less than the death sentence would be disrespectful to the dead, we conclude that the prosecutor was merely pointing out to the jury that our society values human life, and in order to respect the value of human life, one who takes a human life in the manner that Witter did should have to pay for his crime with his own life. Furthermore, the prosecutor's statements painted a vivid picture for the jury, and any reference to "you" appears to be merely rhetorical. For these reasons, we conclude that the prosecutor's statements were proper.
 

 Preventing lawful arrest statutory aggravator
 

 The State included the prevention of lawful arrest statutory aggravator listed in NRS 200.033(5)
 
 [7]
 
 as one of the aggravating circumstances in its notice of intent to seek the death penalty. Witter made a motion to strike that aggravator, arguing that the
 
 *929
 
 evidence adduced at trial shows that he killed James in an attempt to continue his sexual assault on Kathryn, not to avoid arrest. The district court denied Witter's motion. Witter now contends that the district court abused its discretion.
 

 In Cavanaugh v. State, 102 Nev. 478, 729 P.2d 481 (1986), this court held that for purposes of NRS 200.033(5), the arrest does not need to be imminent, and the victim does not have to be involved in some way with effectuating the arrest. More recently, in Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993), cert. denied, 513 U.S. 862, 115 S. Ct. 176 (1994), the evidence adduced at trial showed that Canape robbed his victim then walked him away from the freeway before shooting him in the back. We held that based on the evidence of the case, a jury could reasonably infer that the murder was committed to avoid lawful arrest. Id. at 874-75, 859 P.2d at 1030.
 

 In this case, Witter attacked James only after James told Witter that Kathryn was his wife and ordered Witter to exit the vehicle. Once Witter killed James, Witter grabbed Kathryn and forced her back into the vehicle. Rather than fleeing, or killing Kathryn to make sure no one could identify him, Witter hid James' body under his cab and resumed his sexual assault on Kathryn. The natural inference drawn from these facts is that Witter killed James so that he could continue his assault on Kathryn, not to avoid arrest. Clearly, the prosecution has not met its burden of proving this aggravator beyond a reasonable doubt. We therefore conclude that the jury could not have reasonably found that the murder was committed to avoid lawful arrest and that the district court erred when it denied Witter's motion to strike the aggravator.
 

 In McKenna v. McDaniel, 65 F.3d 1483 (9th Cir. 1995), the Ninth Circuit Court of Appeals was faced with a situation similar to the case at bar in which one of the aggravating circumstances used to sentence MeKenna to death was found invalid. In commenting on Nevada's death penalty statute, the court stated:
 

 Even in a weighing state, however, invalidation of one of several aggravating factors may make no difference if there were no mitigating circumstances against which the state court could balance the remaining aggravating factors. See Neuschafer v. Whitley, 816 F.2d 1390, 1393 (9th Cir. 1987). But where some mitigating factors exist, there must either be a new sentencing hearing before a jury or the state appellate court must reweigh or conduct harmless error review in order to give the defendant the individualized considerations required by the Constitution. Clemons [v. Mississippi], 494 U.S. [738] at 746, 752, 110 S. Ct. [1441] at 1447, 1450.
 

 
 *930
 

 Id.
 
 at 1489-90. Even though we conclude that the prevention of lawful arrest aggravator should have been stricken, there remain four aggravators that the State has proven beyond a reasonable doubt. In mitigation, Witter offered the testimony of several members of his family and the testimony of a clinical psychologist, all of whom testified that Witter grew up in a very abusive and dysfunctional family. We conclude that the remaining four aggravators clearly outweigh the mitigating evidence presented by Witter. Moreover, for the same reason, we conclude that the district court’s failure to strike the prevention of lawful arrest aggravator amounts to harmless error.
 
 See
 
 Chapman v. California, 386 U.S. 18 (1966). We therefore conclude that even though the district court erred in allowing the prevention of lawful arrest aggravator to be considered by the jury, Witter’s sentence of death is still proper.
 

 Mandatory statutory review
 

 Finally, we conclude, pursuant to NRS 177.055, that (1) the evidence fully supports the finding of four valid aggravating circumstances, (2) the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor, and (3) the sentence is not excessive, considering both the crime and the defendant.
 

 CONCLUSION
 

 For the reasons stated above, we conclude that except for Witter’s challenge to the prevention of lawful arrest statutory aggravator, all of Witter’s arguments are without merit. Accordingly, we affirm Witter’s judgment of conviction. With regard to the prevention of lawful arrest statutory aggravator, we conclude that the State has failed to prove the aggravator beyond a reasonable doubt. Nevertheless, because we conclude that the remaining four aggravators clearly outweigh the mitigating evidence presented by Witter, we affirm Witter’s sentence of death.
 

 [1]
 

 EJDCR 7.70 states, in pertinent part:
 

 The following areas of inquiry are not properly within the scope of voir dire examination by counsel:
 

 (b) Questions touching on anticipated instructions on the law.
 

 (c) Questions touching on the verdict a juror would return when based upon hypothetical facts.
 

 [2]
 

 NRS 50.155(1) states that “[ejxcept as otherwise provided in subsections 2 and 3, at the request of a party the judge shall order witnesses excluded so they cannot hear the testimony of other witnesses, and he may make the order of his own motion.”
 

 [3]
 

 Jury Instruction No. 7 stated:
 

 Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.
 

 Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.
 

 Jury Instruction No. 9 stated:
 

 Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
 

 Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For the killing has been preceded by and has been the result of premeditation, no
 
 *918
 
 matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.
 

 Witter's proposed instruction stated: "Deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed cause of action."
 

 [4]
 

 NRS 175.552(3) states, in part:
 

 3. In the [penalty] hearing, evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible. . . . No evidence which was secured in violation of the Constitution of the United States or the constitution of the State of Nevada may be introduced. . . .
 

 [5]
 

 NRS 200.030(4) states, in part, that “[a] person convicted of murder of the first degree is guilty of a category A felony and shall be punished: (a) By death, only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances.”
 

 [6]
 

 NRS 175.141 states, in pertinent part:
 

 The jury having been impaneled and sworn, the trial shall proceed in the following order:
 

 5. When the evidence is concluded, unless the case is submitted to the jury on either side, or on both sides, without argument, the district attorney, or other counsel for the state, must open and must conclude the argument.
 

 [7]
 

 NRS 200.033(5) states that "[t]he murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody."